Filed 1/30/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| WILFREDO VELASQUEZ, | B247080 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC370319) |
| v. | |
| CENTROME, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Anthony J. Mohr, Judge.  Reversed and remanded.

Metzger Law Group, Raphael Metzger, Kimberly A. Miller, Kathryn A. Saldana, and Kenneth A. Holdren; Simon Greenstone Panatier Bartlett and Brian P. Barrow for Plaintiff and Appellant.

Horvitz & Levy, David M. Axelrad and Bradley S. Pauley; Lewis, Brisbois, Bisgaard & Smith, Peter L. Garchie and Ruben Tarango; Sedgwick, Craig S. Barnes and Robert Kum for Defendant and Respondent.

The Hastings Appellate Project, Gary A. Watt, Stephen Tollafield and Tiffany J. Gates; People for the American Way and Deborah Liu; ACLU Foundation of Southern California and Jennifer Pasquarella as Amici Curiae on behalf of Plaintiff and Appellant.

National Immigration Law Center, Linton Joaquin, Karen C. Tumlin and Joshua Stehlik; California Rural Legal Assistance Foundation and Della Barnett as Amici Curiae on behalf of Plaintiff and Appellant.

The Consumer Attorneys of California, Arbogast Law and David M. Arbogast as Amicus Curiae on behalf of Plaintiff and Appellant.

The Amicus Project at Southwestern Law School, Ryan Abott and Matthew Graham as Amicus Curiae on behalf of Plaintiff and Appellant.

_____

Plaintiff and appellant Wilfredo Velasquez appeals from a judgment after jury trial of his product-related personal injury action. Velasquez alleged his lung disease was caused by workplace exposure to a chemical compound, diacetyl, that was distributed by defendant and respondent Centrome, Inc. dba Advanced Biotech (Advanced). The trial court entered judgment on the jury's special verdict which included findings, as to multiple causes of action, that Advanced's acts were not a substantial factor in causing harm to Velasquez.

After finding the issue relevant to Velasquez's ability to receive a lung transplant, the trial judge advised the prospective jurors during jury selection that Velasquez is an undocumented immigrant. Velasquez claims the jurors who decided his case were incapable of being fair given their knowledge of his immigration status. We find the trial court erred when it disclosed Velasquez's undocumented immigrant status to the venire of prospective jurors, and in denying a motion for mistrial. We find the denial of Velasquez's motion for mistrial requires that the judgment be reversed.

## FACTS

### *Background*

In the summer of 2003, Velasquez started working as a temporary employee at Gold Coast, a company that made food flavorings. At some point in 2004, he became a permanent employee. While working at Gold Coast, Velasquez moved diacetyl, in both closed and open bags and containers, throughout the company's facility. He breathed

2

ambient diacetyl particles in the air while using a sprayer to mix diacetyl into batches of liquid and dry flavorings, and while hand pouring the compound into mixes.[1]

During the time that Velasquez worked at Gold Coast, Advanced supplied roughly 80 percent of the diacetyl that Gold Coast used in its facility. Advanced did not manufacture the diacetyl. Advanced purchased the compound from suppliers then distributed it to customers like Gold Coast. Advanced attached material safety data sheets (MSDS's) to the containers of diacetyl it distributed to its customers. The MSDS's warned that diacetyl was "harmful by inhalation," but did not include specific warnings about the risks of any particular diseases from exposure to the compound. At trial, it was undisputed that Advanced's warnings were consistent with flavorings industry practices at the time that Velasquez was working at Gold Coast. The California Division of Occupational Safety and Health did not issue exposure limits for diacetyl until 2010, more than four years after Velasquez stopped working at Gold Coast. There were no federal regulations governing exposure limits for diacetyl while Velasquez worked at Gold Coast. Even by the time of trial of Velasquez's current case in 2012, the Federal Drug Administration continued to classify diacetyl as "Generally Regarded as Safe."

During a mixing incident in September 2005, Velasquez inhaled fumes from a concentration of compounds that included acetaldehyde, but not diacetyl. Following the incident, Velasquez experienced trouble breathing, and first sought medical attention for breathing issues. A doctor at a local hospital gave Velasquez an inhalator, along with a paper indicating he had a respiratory infection. When his breathing difficulties did not improve, Velasquez returned to the hospital two more times in the next two months. In November 2005, Velasquez's supervisor took him to the "company clinic" at Gold Coast's facility, where a "company doctor" told him he could not continue working for

---

[1]     Diacetyl imparts a buttery taste.

3

the company in his condition. Velasquez's last day of employment at Gold Coast was November 16, 2005.

In late November 2005, Velasquez went to Mike Mirahmadi, M.D., for treatment. Velasquez complained of shortness of breath. Dr. Mirahmadi noted Velasquez was using an inhaler intended for asthma, and that Velasquez attributed his breathing problems to work. Dr. Mirahmadi instructed Velasquez to continue using the inhaler and to stop working for 30 days to see if absence from his workplace helped his symptoms. Dr. Mirahmadi referred Velasquez to a lung specialist. It is not clear from the parties' briefs or the record on appeal whether Velasquez followed through on this medical plan. From January to August 2006, Randall Caldron, M.D., treated Velasquez. Dr. Caldron diagnosed Velasquez as suffering from a reactive airway disease or allergic rhinitis. Dr. Caldron prescribed medications commonly used for treating those conditions. According to his complaint, Velasquez was first diagnosed with bronchiolitis obliterans, a rare form of lung disease which is usually progressive and fatal, in December 2006. The circumstances of this first diagnosis are not readily apparent from the parties' briefs on appeal, or their references to the record.[2]

***The Lawsuit and Trial***

In April 2007, Velasquez filed a complaint for personal injuries against several manufacturers and distributors of chemical compounds used to make food flavorings, including Advanced. In June 2011, Velasquez filed his operative first amended complaint. Velasquez's first amended complaint alleged various chemicals and chemical compounds to which he was exposed while working at Gold Coast caused his lung disease. The following causes of action, listed respectively, were eventually tried to a jury and submitted for its consideration by way of a special verdict form: negligence (breach of duty, including duty to warn of risks); negligence per se (negligence based on violations of regulations governing mandatory hazardous materials warnings); strict

---

[2] The trial record does indicate that bronchiolitis obliterans is best diagnosed from pulmonary function tests and CT scans.

4

products liability — design defect (the consumer expectation test); strict products liability — design defect (the risk-benefit test); and strict products liability — failure to warn of risk that is unknown to user.

### 1. The Motions in Limine

In the months leading up to trial, Velasquez filed a number of motions in limine, including motion in limine No. 46 to preclude Advanced (and, at the time, a number of other defendants) from presenting any evidence or making any comment about his citizenship or immigration status, or showing that he had used falsified information or documents when applying for employment. Velasquez argued that evidence on such matters was inadmissible because (1) it was irrelevant as he was not claiming loss of earnings or earnings capacity; (2) it was more prejudicial than probative on any material issue, and thus excludable under Evidence Code section 352; and (3) it would constitute evidence of "bad acts" tending to prove character, and thus was inadmissible to challenge credibility under Evidence Code section 787.

In its opposition to Velasquez's motion in limine No. 46, Advanced argued that evidence of Velasquez's immigration status was admissible "for the limited purpose of allowing expert testimony . . . on . . . his ability to participate in a lung transplant," which his complaint alleged he would need in the future. Advanced offered to stipulate to granting Velasquez's motion in limine No. 46, provided he dropped his claim that he would need a lung transplant in the future.

In addition to the issues raised by motion in limine No. 46, Advanced filed motion in limine No. 80 to preclude Velasquez from presenting expert evidence related to his alleged need for a future lung transplant. Advanced argued Velasquez's claimed need for a lung transplant was speculative. In support of its argument, Advanced pointed to one of Velasquez's own designated experts, David Ross, M.D., who had recently issued a report indicating Velasquez's medical condition did not require an immediate lung transplant, and concluding only that he would need one "in the future." Advanced also pointed to another of Velasquez's designated experts, David Egilman, M.D., who had recently

5

indicated Velasquez "may not be eligible for a lung transplant." Advanced requested an order excluding evidence regarding the need for a lung transplant, and the associated costs of such a procedure. Alternatively, Advanced requested that the trial court conduct a hearing under Evidence Code section 402 regarding the factual foundation for Dr. Ross's anticipated opinion at trial that Velasquez would need a lung transplant at some point in the future.

At a pretrial status conference hearing, the trial court deferred a ruling on either motion in limine until after the experts had been deposed. In stating its decision, the court made the following comments: "If it weren't for the need of the lung transplant, I would just exclude all evidence about his alienage status and that would be the end of it. [¶] I think it's clear under Evidence Code [section] 352 it would be unduly prejudicial. But I really think I ought to wait and see what the experts have to say about this issue before I make a ruling."

### 2. *Voir Dire*

After several weeks of hearings on motions and pretrial matters, the case was called for trial and the lawyers announced they were ready. The prospective jurors, who had previously filled out a questionnaire, were then called into the courtroom. The trial court started voir dire with broad questions to the prospective jurors en bloc on subjects such as whether they could keep an open mind, whether they would follow the court's instructions, and the concept of the burden of proof.

At the start of the afternoon session, before the prospective jurors returned, the trial court and the lawyers took up the issue of the possible trial testimony of Velasquez's "transplant expert," Dr. Ross, a physician at UCLA Medical Center. Dr. Ross had recently seen Velasquez (either as a treating physician or as a plaintiff's expert) regarding a possible lung transplant. Among the matters discussed regarding Dr. Ross's anticipated testimony were whether he could and would testify to a degree of medical certainty or probability that Velasquez needed a lung transplant, and Dr. Ross's insights on whether

Velasquez would be accepted for a lung transplant in light of his undocumented status. During the course of these extended discussions, the following exchange transpired:

"The Court: But we've got several things going against the plaintiff [with regard to the showing that he needs a transplant]. First and foremost, he really hasn't been totally evaluated through UCLA. We really don't have a complete workup here. . . . I don't want to call this an afterthought, but it really does appear to be that, the whole transplant issue. It came from an attorney . . . . I'm talking about the person over on the workers' comp side. [¶] They sent [Velasquez] to UCLA. They really don't have time to work him up. Ross thinks he's the treater. Ross writes a report that says [Velasquez] doesn't need a lung transplant. You know, who knows about the future. Then apparently, Ross says, 'I didn't know this was a sham consult and I'm not really going to be an expert witness' – Words to that effect. And he now begins to move more towards a degree of certainty or medical probability. He'll need it. But what leaks out in his testimony is if [Velasquez is] deemed an acceptable candidate. And what also leaks out is I don't have any certainty as to when [the need for a transplant] may or may not occur. I mean, at the end of the day, [the cases say] . . . if there's enough for the jury to believe here like 10, 20 percent, we let it go to the jury. And I saw [plaintiff's] cases. And I thought long and hard about it. But I'm not sure there's really enough here to do it."

"Mr. Metzger [plaintiff's counsel]: Well, your Honor. We could have a hearing of Dr. Ross. Put him on the stand and --- that's what we do.

"The Court: Believe me, Mr. Metzger, I've thought about that. But let me tell you what the ground rules are if we do that. And that is, I'm not stopping voir dire. We go forward --- I don't know when Ross is available --- and you take your chances. If you want to ask [the prospective jurors] about lung transplants in voir dire, you can ask [them]. If you want to ask

7

about immigration status, you can ask [them]. But I'm telling you now that, you know, I don't want to stop the trial for a week or two while we try to figure out when Ross can come in for a 402.

"If I deny the in limine motion — and I must tell you I am leaning slightly in that direction. But if I deny it, that's without prejudice to hearing Ross on a 402, and unless he can get better [in his proposed testimony], you know, I probably would end up granting this.

"Mr. Metzger: Well, your Honor, let me make a suggestion, then. If that's where we're going, then okay. In that case there should be no mention of alienage status because your Honor may ultimately exclude Dr. Ross, in which case it doesn't come in.

"The Court: That's fine. You know, the only reason I bring that up is, you know, you could end up having that bomb explode in the courtroom once the transplant evidence comes out. I just want to give you that fair warning. [¶] So if you thought to yourself I really want to, you know, inoculate them against that prejudice now, I would say absolutely. Go right ahead and do it. But if you want to keep it silent, then, you know, on your say-so, I will order that nobody mention alienage status.

"Mr. Metzger: Right. . . . I will need to consult on this; so I'm not prepared to say today.

"The Court: Okay. You certainly don't need to get there today.

"Mr. Metzger: The difficulty is that either way, you know, it's a Hobson's Choice because . . . the evidence of alienage is so prejudicial. . . . This raises major, major issues about discrimination in medicine, discrimination in the courts. It's a real hornet's nest.

"The Court: Mr. Metzger, I hear you. But at the same time, you know, I don't even have to go there. I can just simply say to you that there is evidence here that I've read that . . . in terms of being eligible for a lung

8

transplant, they have to know you are going to be around.  And if you are an illegal alien, you may not be around.  You may get deported.  That's the cold hard fact of the matter.

"Mr. Metzger:  The fact is [Velasquez] can afford a lung transplant in South America or Europe or wherever.  I mean, based upon the settlement this morning, he'll be able to pay for the transplant procedure.  So . . . [i]t is a red herring this whole deportation issue.  Because he's an undocumented worker he may be deported, therefore, he won't get a lung transplant.  Absolutely untrue.  He'll get it.  He has the money for it.  So that's really a red herring, and it's absurd.

"Mr. Kum [counsel for Advanced]:  Your Honor, we think the appropriate ruling is that you tentatively grant the motion in limine.  If plaintiff's counsel wants to try to put Dr. Ross on the stand, then I agree there should be a 402 hearing in the morning before he takes the stand.  But I think the tentative should be to grant because ----

"The Court:  Well, I want to let Mr. Metzger make the decision about whether to voir dire the jury on him being an illegal alien.  Okay?  If you want to voir dire the jury on that point, fine, you know, you can do so.  [¶]  If you don't want to voir dire the jury on that point, fine.  And if you don't want to voir dire the jury on that point, then probably the best thing to do  — well, let me just say it's your call.  It's your call.  And then I would just wait for the 402 and make the final decision.

"Mr. Metzger:  My tentative thinking is I would not voir dire the jury regarding that because it's so horridly prejudicial.

"The Court:  And you sure don't have to make that decision today.  We've got about 45 minutes.  There's plenty of things to ask them about."

9

The trial court then tentatively granted Advanced's motion in limine No. 80 to exclude evidence of Velasquez's need for a transplant. At the same time, the court ordered all of the lawyers "not to refer at all to Mr. Velasquez's immigration status, ask no questions about it, refer to nothing about it." The court indicated its ruling would be reconsidered at an Evidence Code section 402 examination of Dr. Ross at a time of the lawyers' choosing, based on Dr. Ross's availability. The court then continued:

"If Mr. Metzger wishes to voir dire the jury on alienage status, he may do so. And that would, of course, void my order immediately. He will just have to let me know. But at this point, with the understanding Mr. Metzger does not want that to come in, it will not. [¶] The court in limine will bar all references to Mr. Velasquez's immigration status. And as I said, I look forward to the 402 because it could well be that this area . . . would be something where the item of damages would be permissible under the law. It's exceptionally close. But for now, in an abundance of caution, I'm going to keep it out."

A few days later, the court took a break from voir dire and conducted an Evidence Code section 402 (hereafter section 402) hearing on the possible testimony of Dr. Ross. Dr. Ross testified that Velasquez suffered from constrictive bronchiolitis obliterans, and that it was likely he would require a lung transplant. Dr. Ross explained that bronchiolitis obliterans is an unpredictable condition and, five years from diagnosis, only about 28 to 30 percent of patients survive without a transplant. Dr. Ross testified that his team at UCLA had never rejected a lung transplant candidate because of national origin or because the patient was an undocumented worker. He further indicated that the policies of the United Network for Organ Sharing's (hereafter UNOS)[3] allow up to five

---

[3] According to its website, UNOS is a private, non-profit organization that manages the country's organ transplant system under contract with the federal government. (*www.**unos**.org.)

10

percent of the transplants performed in a year to be conducted on foreign nationals. Following cross-examination by trial counsel for two defendants, the trial court asked some questions of Dr. Ross on its own in the following exchange:

"The Court: Let me ask you this question. Apparently – and I don't know this for a fact, but apparently Mr. Velasquez is not in this country legally. Now, when your team sits down to make a decision as to whether he needs a lung transplant, is that going to have any impact at all in the decision?

"[Dr. Ross]: If he's no longer in this country?

"The Court: If he is illegally in this country.

"[Dr. Ross]: Illegally?

"The Court: Subject to deportation, regardless of the statistics or the chances of deportation, will the fact that he is here illegally, if, in fact, that's true, have any impact at all on your group's decision at UCLA to transplant him?

"[Dr. Ross] : Well, the way that we make the decision about transplants is that it's a multidisciplinary meeting where we have the transplant pulmonologist such as myself, surgeons, social workers, psychiatry, the finance department, and other members of transplant administration. We make the decision first whether from a medical standpoint if the patient needs a transplant and meets the criteria for transplant.

"The Court: Medically.

"[Dr. Ross]: And then we ascertain whether they have the financial support for a transplant.

"The Court: Let's assume that's all a positive. Let's assume he medically needs it and he can pay for it. Now what happens?

11

"[Dr. Ross]: *And then we would have to look into the issue about . . . him being here illegally*, about whether that would be acceptable for a transplant with UNOS's policy or not, *and whether we could ensure that he would have follow-up in a transplant program after the transplant. So this is something that would have to be discussed in the setting of the meeting.*

"The Court: What I'm hearing is it could have an impact. I don't want to put words in your mouth, but that's what I'm hearing.

"[Dr. Ross] *It most definitely would have to be discussed, and it could have an impact.*" (Emphasis added.)

At the conclusion of the section 402 hearing, the trial court ruled: "[T]here is no question but that Mr. Velasquez's immigration status is going to have a role in this." When counsel for Velasquez attempted to offer an argument, the trial court responded: "Mr. Metzger, I've heard enough. I heard what [Dr. Ross] said. It plays a role. His immigration status will be admitted in this trial. I'm going to deny your in limine motion to keep it out. That's my ruling." In making its ruling, the court acknowledged that evidence of immigration status was "highly, highly prejudicial," but that its probative value in Velasquez's case was "definitely more than a little." The trial court denied Velasquez's request to certify the issue for an immediate appeal and to stay the case, noting the court and the parties were in the "middle of jury selection."[4]

Upon objection from Velasquez's counsel, the trial court started the next morning's session by revisiting its ruling of the previous day that evidence about Velasquez's undocumented immigration status would be admissible at trial. The court indicated that it was not inclined to change its view, noting Dr. Ross had "testified very

---

[4] Velasquez filed a petition for writ of mandate in our court challenging the trial court's ruling on the admissibility of evidence of alienage and residency status. (Case No. B244365.) We summarily denied the writ petition on October 5, 2012.

clearly" that Velasquez's immigration status would "play a role" when his doctors decided whether he would receive a lung transplant. The court ruled: "[T]he evidence is probative and the tendency to unduly prejudice does not substantially outweigh the probative value." At the same time, the court cautioned the defense that "[t]he fact that he's illegally here does not impact his credibility in my mind. And I don't want it used for that purpose . . . . The only reason the jury is to consider this has to do with his eligibility for a lung transplant. And if anybody wants to submit a special instruction to me, I will instruct the jury that this is not to be considered for his credibility."

Velasquez's counsel orally moved for a mistrial, and the trial court denied the motion.[5] At this point, Velasquez's counsel advised the court that, given its ruling about Velasquez's immigration status, counsel felt he had "no choice" but to bring up the issue with the prospective jurors. A discussion then ensued between the court and all of the lawyers about the best way to handle the situation, as Velasquez's counsel had already asked a significant number of questions on voir dire without addressing the undocumented immigrant issue. When Velasquez's counsel asked the court to inquire whether the defense lawyers actually intended to offer evidence on Velasquez's immigration status, counsel for the remaining defendants at that time, including counsel for Advanced, declined to stipulate that they would not raise the issue.

Eventually, it was agreed that the court would advise the jurors about the issue. As the court summarized the situation: "I'll basically just say that . . . based on some rulings I've made, you are going to hear some information regarding his alienage status. . . . [¶] . . . I want to be the one to raise it. And I may well take on some blame for not letting the topic out earlier. I want to be the lightning rod to the extent the jury feels anything was hidden from them."

---

[5] Velasquez's counsel did not state grounds for the motion for a mistrial, and the court denied the motion without comment. In context, the motion plainly rested on the trial court's ruling that evidence of Velasquez's immigration status would be admissible at trial.

When the prospective jurors returned to the courtroom, the trial court made the following statement:

"I want to give you a brief update on the matter before we proceed because it will impact the questioning that occurs. As you know, we all meet sometimes outside of your presence and make certain decisions with respect to the case. And as I told you in the orientation, you know, while you are the judges of the facts, I'm the person who gets to decide what you are going to hear and what you're not going to hear.

"And yesterday and this morning counsel and I had a discussion. And I want to bring up a subject where because we've now determined or I've determined that this is something you are going to hear. And that is that Mr. Velasquez is not legally in the United States. Okay?

"Now, I want to tell you that under our laws, citizens and noncitizens alike have access to our courts, and they have certain rights not only in the civil courts as well as in the criminal courts. The fact that a person is not here legally doesn't mean that, you know, he can be arrested and put in jail without a trial. He or she has all the constitutional rights that a citizen does. Same on the civil side. If you were driving your car and you slammed into somebody who was not authorized to be in the United States, you could still be liable for a lot of money if you hurt that person. Okay?

"The fact that that person isn't here legally doesn't mean anything. And similarly in this case, Mr. Velasquez has a right to bring this lawsuit even though he may not be a citizen, even though he may be not here legally. Now, my first question to you is this: Having told you this — and I'm asking the whole group — is there anybody here who just says, 'Oh, my Lord. You know, the light goes on, I can't be fair. I'm going to rule against him'? Does anybody feel that way? I see no hands. . . .

14

"[¶] . . . [¶]

"Okay. . . . Now, let me turn it around. Is there anybody who feels – obviously the plight of people in various countries is – can be regrettable. And many of these people want to come to the United States to work and provide for their families even though they may not be able to get a visa or get permission to come here.

"Does anybody feel that because Mr. Velasquez took the time, had the courage, whatever, to come here, you are going to rule for him? Now that you know this he wins the case? Does anybody feel that way? [¶] I see no hands."

The trial court then instructed the prospective jurors as follows:

"[Y]ou are not to consider his immigration status as bearing on his credibility as to whether what you hear from him is truthful or not truthful. I don't want you to consider his immigration status for that purpose. It's only to be considered with respect to his eligibility for a certain type of medical procedure."

At the end of its statements and instructions to the prospective jurors on the issue of Velasquez's immigration status, the trial court asked again about their attitude regarding the issue as follows: "So will you all agree that you will not consider his status as a citizen, a noncitizen, authorized, or unauthorized — you will not consider that as bearing on his . . . truth telling? Is that a promise?" The prospective jurors, answering in unison, responded "yes." At this point, Velasquez's counsel resumed his individual voir dire of the jurors.

Near the end of the day, all counsel accepted a panel of 12 jurors. The next day, voir dire of a group of 18 prospective alternate jurors began. At the beginning of the voir dire, the trial court collectively asked the 18 prospective alternate jurors whether they could be fair in the case. Six raised their hands and requested sidebar discussions with

15

the trial court. Of those six, four expressed concerns directly related to Velasquez's immigration status. The court excused those four prospective alternates, and noted the difference in reactions to immigration status from the original set of prospective jurors: "Not one juror, and now we get all these other ones."

During further voir dire, four other prospective alternates openly expressed views regarding Velasquez's immigration status. One favored Velasquez; another stated that he did "have an issue with him being here illegal and suing," and explained that his "beliefs are part of who I am because of my experiences. I'm sure they would play some factor in a decision. Maybe not number one, but those feelings would, quite honestly, factor in somewhere." Another admitted he could not be fair, and stated, "If he weren't here illegally, maybe he wouldn't have gotten injured." Another stated the blame for Velasquez's injury was with the employer, and she was "concerned that . . . the employer for Mr. Velasquez hired him to begin with."

At the end of the day, Velasquez's counsel expressed concern to the court about the prospective alternate juror who made a comment about Velasquez's employer having illegally hired him. Velasquez's counsel requested permission to voir dire all of the prospective jurors (including going back to the 12 who were already sworn) on their attitudes toward employers who illegally hire undocumented immigrants. The following exchange ensued:

> "Mr. Metzger: . . . I need to question these people regarding their individual [views on employers]. I haven't done that. [¶] All that I did — if you recall, all that I did was [ask questions about] organ transplantation and alienage. That is all I've covered. So I do have ---
> "The Court: Can you do it in an hour? Can you get this taken care of in an hour?
> "Mr. Metzger: I would hope so. We have had a lot of surprises from this bunch.
> "The Court: Unlike the first 12, this is a very surprising group.

16

"Mr. Metzger:  Your Honor, I do want to get something on the record.  [¶]  I am very concerned because I find it extremely odd that the first 18 had no problems with the alienage and this group had --- there were several who had lots of problems.

"The Court:  Four or five or six.

"Mr. Metzger:  I'm concerned with what has happened here is the initial 18, we have gone through voir dire, a lot of voir dire without that being raised as an issue.  They already felt vested, and biases did not come out.  [¶]  And this group didn't.  They weren't vested because they hadn't been questioned yet.  Now we have all these biases coming out.  I'm very concerned.  [¶]  I am going to make a motion for a mistrial.

"The Court:  Based on that? . . .  I know you made one yesterday.

"Mr. Metzger:  I will renew it again.  You may hear it from me --- I don't think the way this whole thing has happened, has unfolded, is appropriate.  I think it creates extreme prejudice and bias.  I'm moving for a mistrial.

"The Court:  Okay.  Anything from the defense?

"[¶] . . . [¶]

 "Mr. Garchie [counsel for Advanced]:  Your Honor, I think the record will speak for itself that this is a volatile issue, immigration, alienage.  Some people have strong views.  [¶]  I think that the panel that we have now, the first 12, I think, were thoroughly vetted.  I think they were asked many questions concerning alienage, and my impression is that they were forthright and honest and gave appropriate views on it.  [¶]  I don't see any type of subliminal type of discrimination that Mr. Metzger does, and I don't believe it would be appropriate to grant a mistrial under the circumstances.

"The Court: Go ahead.

"Mr. Cray [counsel for another defendant]:  Your Honor, I think you've been more than fair on this particular issue of alienage.  You allowed Mr.

17

Metzger to go into it. With every single juror or prospective juror, he has gone into it. If anyone was close, if anyone had a thought that it was going to weigh on their decisions, your Honor has allowed them for cause, and I think you've been more than fair. [¶] Counsel is now speculating that somehow someone kept something from him and didn't share their feelings. I think the first 18 people shared their feelings a lot with us, and we had three or four days with them for them to share their feelings. I don't think they had a lot of secrets.

"The Court: You know, I don't blame Mr. Metzger. You know, it's a major issue. [¶] There is no question -- you know, you've got that case --- I forget the name of it --- from the Fourth District with Judge Brooks. Although, as I said before and I'll say again, the facts are very different, very sharply different. [¶] The short answer, Mr. Metzger, is I'm denying your motion for a mistrial."

Voir dire of the prospective alternate jurors resumed, and continued into the afternoon session. Early in the afternoon, counsel for Velasquez and counsel for Advanced (which by this time was the only remaining defendant) accepted six alternate jurors. The trial court thereafter gave preliminary jury instructions before ending the court day. The court instructed the jurors with standard civil jury instructions as follows:

"You must not be biased in favor or against any witness because of his or her disability, gender, race, religion, ethnicity, sexual orientation, age, national origin, or socio-economic status." Further: "You must not let bias, prejudice, or public opinion influence your decision. Your verdict must be based solely on the evidence presented."

In accord with the wishes of Velasquez's counsel not to draw attention to the issue, the trial court did not give a specific cautionary instruction on Velasquez's status as an undocumented immigrant.

18

### *3. Trial and the Jury's Special Verdict*

Trial was dominated by expert testimony. Nearly a dozen medical doctors testified on the subject of Velasquez's medical history, his current medical condition, his prognosis, his medical treatment to date, and his need for future medical treatment, including his need for a lung transplant.

David Egilman, M.D., testified on Velasquez's behalf on the issue of whether diacetyl caused Velasquez's bronchiolitis obliterans. Brent Findley, Ph.D., testified on behalf of Advanced on the issue of causation, focusing more broadly on the state of ongoing scientific research regarding whether diacetyl causes bronchiolitis obliterans. The testimony of these causation experts is discussed in more detail below.

After a number of witnesses had testified, Velasquez filed a written motion for mistrial. The motion was supported by a declaration from Mark Nicas, Ph.D., an adjunct professor of environmental health sciences at the University of California, Berkeley, and the Director of the Industrial Hygiene Graduate Program at the university's School of Public Health. Dr. Nicas's declaration addressed the subject of whether there was a "statistically significant difference of expressed alienage bias" as between the group of 18 prospective jurors from whom the 12 jurors ultimately empanelled had been selected (so-called Group A), and the group of 18 prospective jurors who were voir dired to be alternate jurors (Group B). Dr. Nicas stated there was a numerical difference in responses between the two groups and that it was "unlikely," based upon an application of a generally accepted statistical analysis procedure that the difference was "due to chance alone." Dr. Nicas expressly indicated he could not identify a cause for his statistical conclusions; he only concluded there was a significant difference in responses between the groups, and, based on the statistical analysis, it was "highly unlikely to be the result of chance alone." Outside of the presence of the jury, the trial court denied Velasquez's motion for mistrial.

Dr. Ross testified for Velasquez regarding his need for a transplant. Dr. Ross testified that Velasquez did not currently need a lung transplant, but would need a transplant in the future because there were few other treatment options for bronchiolitis obliterans. According to Dr. Ross, he was "very confident that [Velasquez] will need a transplant within the next five years." Dr. Ross also testified regarding the myriad of medical, psychological, cost, support and other factors which are considered in the decision as to whether a particular patient will receive a lung transplant, or, more generally, "the topic of lung transplant candidacy." Dr. Ross explained that Velasquez had no medical or psychiatric factors which would disqualify him from receiving a lung transplant, and that he had sufficient family and social support structures for a possible lung transplant. Dr. Ross further explained that the lung transplant program at UCLA had never rejected a lung transplant patient based on his or her race, national origin, or residency or naturalization status, and that "we're prohibited from considering that." Dr. Ross explained that UNOS had recently issued "new" policies which provided that it would not consider residency and immigration status when making decisions on transplant approvals. The new UNOS policies were put in place in September 2012.

Velasquez made yet another motion for mistrial, which was denied. Advanced filed a written motion for nonsuit as to Velasquez's claim for punitive damages, and his causes of action for strict liability on design defect and failure to warn theories, and for common law negligence. On the common law negligence issue, Advanced argued Velasquez had not presented any evidence establishing the standard of care in the food flavoring industry at the time Velasquez was exposed to diacetyl.

The trial court subsequently conducted a section 402 hearing on the potential trial testimony of defense expert Gordon Yung, M.D., regarding Velasquez's need for a lung transplant. Dr. Yung opined that Velasquez would not need a transplant. Dr. Yung was also a representative from one of the regional administrative bodies of UNOS, and a member of UNOS's lung transplant subcommittee. During the section 402 hearing, the court addressed Dr. Yung's possible testimony on the issue of whether Velasquez's

20

immigration status would be a factor in his eligibility for a lung transplant. Dr. Yung testified that immigration status would "never" be considered as a "pure criteria" that disqualified a patient from receiving a lung transplant. At the conclusion of Dr. Yung's testimony, the trial court made the following ruling:

"The Court: Dr. Ross has stated look, this policy is new. It just came in. Within, you know, I guess since this summer. Dr. Yung doesn't contradict that. If anything, Dr. Yung doesn't know. So I accept Dr. Ross's testimony. *It's clear to me now that a person's immigration status has nothing to do with whether or not he or she is eligible for a lung transplant.*

"At this point there has been no evidence in front of this jury about Mr. Velasquez's immigration status. There have been statements during voir dire and statements during, I think, opening statement, but I'm not positive about that, but certainly during voir dire. But no evidence as such has reached this jury's ears and eyes.

*"And I'm now going to rule that that will continue to be the case. There will be no evidence in this case about Mr. Velasquez being in this country illegally.*

"So, doctor, when you testify, I'm ordering you not to discuss immigration status and to mention Mr. Velasquez's immigration status regarding his criteria for a lung transplant." (Emphasis added.)

Shortly after the trial court's ruling, the following exchange ensued:

"The Court: Okay. The record will reflect the jurors, the alternates are out. At some point [Mr. Metzger] --- you don't have to do this immediately. And obviously, this won't happen until I get back, but it may be worth doing it sooner, Mr. Metzger, and that is you may want to consider drafting some sort of curative instruction or admonition regarding

21

the plaintiff's immigration status, because it's very clear from Mr. Yung that [Velasquez's immigration status is] irrelevant, and under Evidence Code 352, I am going to exclude it because I do think that the potential for time consumption, confusion of the jury, and the insertion of extraneous issues, if you will, substantially outweighs its probative value. So if you want to draft some sort of cautionary instruction, whatever it is, you are free to do it.

"Mr. Metzger: I don't think it can be cured, your Honor.

"The Court: Well, I know that's your position for the record. It's up to you what you want to do. . . . [¶] I think the trial is still on board. I understand your position. Obviously, this all popped up right around the time that [Velasquez] was seeing Dr. Ross, and the timing couldn't have been worse, but we'll just forge ahead."

The presentation of the witnesses' testimony continued and came to an end. The lawyers gave closing arguments. The jury began its deliberations.

Two days later, the jury returned a special verdict which included the following findings, among others: (1) Advanced had been negligent; (2) Advanced's negligence was not a substantial factor in causing harm to Velasquez; (3) Advanced had violated one or more of the provisions of the Hazard Communication Standard (see 29 C.F.R. § 1910.1200);[6] (5) Advanced's violation of the Hazard Communication Standard was not a substantial factor in causing harm to Velasquez; (6) the design of Advanced's diacetyl was not a substantial factor in causing harm to Velasquez; (7) Advanced's diacetyl did not fail to perform as safely as an ordinary person would have expected when used or

---

**6** The Hazard Communication Standard, commonly known as the "right to know law," is intended to ensure that hazards of chemicals are identified, and that information concerning those hazards is shared with employers and employees.

22

misused in an intended or reasonably foreseeable way; (8) ordinary persons would have recognized the potential risks of diacetyl.

A jury poll revealed that the findings that Advanced had been negligent and violated the Hazard Communications Standard were unanimous. The remaining findings were reached by a nine to three vote.

The trial court granted Advanced's motion for nonsuit on Velasquez's common law negligence theory. The court then entered a minute order indicating it signed and entered a judgment on the jury's special verdict.[7]

Velasquez filed a timely notice of appeal.

## DISCUSSION

### I.     Velasquez's Claims are not Forfeited

Advanced contends Velasquez forfeited any claim of error related to the trial court's statements to the jurors during voir dire concerning his immigration status. We disagree.

First, Advanced asserts Velasquez invited the trial court to make its statements to the jurors regarding his status as an undocumented immigrant. Second, Advanced contends Velasquez may not complain on appeal because he declined the trial court's offer to give a curative instruction on the issue of Velasquez's immigration status. Finally, Advanced claims Velasquez failed to preserve a record allowing for meaningful review of any claim of juror bias by failing to move for a new trial. We are not persuaded by these arguments.

---

[7]     The record on appeal contains a document entitled "Judgment on Special Verdict;" it has a date stamp of December 20, 2012. This document is not signed by the trial court, and does not contain language reflecting the trial court's determination of the rights of the parties. (See Code of Civ. Proc., § 577.) The judgment document in the record consists of a cover sheet stapled to a copy of the jury's special verdict. Inasmuch as the parties to this appeal have argued the merits as though the appeal was taken from a judgment, and because there is a trial court minute order stating that the court "signed" and entered a judgment, we accept, in the absence of any contrary showing, that a final judgment in proper form was signed and entered.

23

An error is invited when a party purposefully induces the commission of error. (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403.)  The doctrine of invited error bars review on appeal based on the principle of estoppel.  (*Ibid.*)  The doctrine is intended to prevent a party from leading a trial court to make a particular ruling, and then profiting from the ruling in the appellate court.  (*Ibid.*)  Accordingly, the doctrine of invited error contemplates "affirmative conduct demonstrating a deliberate tactical choice on the part of the challenging party."  (*Huffman v. Interstate Brands Corp.* (2004) 121 Cal.App.4th 679, 706.)

The record shows no such affirmative conduct in Velasquez's case.  Here, Dr. Ross gave testimony, not elicited by Velasquez, during a section 402 hearing which led to the trial court's initial evidentiary ruling on Velasquez's undocumented status. While Advanced's assertion that Dr. Ross's testimony provided the foundation for the court's statements to the jurors regarding Velasquez's immigration status is correct, this does not mean that Velasquez "invited" any error.  A fair reading of the record establishes that the court made an initial ruling -- later withdrawn by the court as unsustainable -- that a person's status as an undocumented immigrant could be a factor in the decision to provide or deny the person a lung transplant.  The court's initial ruling effectively boxed Velasquez into agreeing to the court's statements to the jury regarding his immigration status.  From the very beginning, Velasquez sought to prevent the jury from hearing about his immigration status.  Under these circumstances, we decline to find a forfeiture.[8]

This brings us to the issue of whether Velasquez was required to file a motion for new trial in order to save his jury-related claims of error on appeal.  Advanced argues that Velasquez forfeited his claims by failing to raise them in a new trial motion supported by admissible evidence of juror bias.  While Advanced's argument might be persuasive in

---

[8]     We apply the same analysis to Velasquez's decision not to accept the trial court's offer to give the jurors a curative instruction.

another context, it is not here. Developing a factual record by a motion for new trial was not necessary in this case to facilitate meaningful appellate review.

Finally, we note that forfeiture is "not automatic" and "does not deprive appellate court[s] of authority" to entertain appeals. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) Forfeiture is largely a matter of fairness, both to the trial court and to an opposing party. Forfeiture is intended to advance the policy of allowing and encouraging the trial court to correct errors in the first instance, thereby avoiding further legal proceedings. The principles underlying forfeiture of claims on appeal may yield when matters involving the public interest or the due administration of justice are implicated. (See, e.g. *Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 712.) Under the unique circumstances presented by Velasquez's current case, forfeiture is not needed to assure fairness to the trial court or to Advanced. We also find Velasquez's claims on appeal are of sufficient public interest to weigh against forfeiture.

II. **The Trial Court Erred When it Informed the Prospective Jurors of Velasquez's Immigration Status**

Velasquez contends the trial court erred when it informed the prospective jurors during voir dire that he is an undocumented immigrant. We agree.

*The Law*

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) "'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts . . . ." (*People v. Scheid* (1997) 16 Cal.4th 1, 13.) A trial court "is vested with wide discretion in determining the relevance of evidence," but it has "no discretion to admit irrelevant evidence." (*People v. Babbitt* (1998) 45 Cal.3d 660, 681.)

But even when evidence is relevant, a trial court may exclude it pursuant to Evidence Code section 352. Under that section, a trial court is vested with discretion to exclude relevant evidence when "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) A trial court's exercise of discretion under Evidence Code section 352 is reviewed under the abuse of discretion standard, and will not be disturbed on appeal except upon the objecting party's showing that the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner. (*People v. Brown* (2003) 31 Cal.4th 518, 534.)

*Analysis*

We agree with Velasquez that when an undocumented immigrant plaintiff files a personal injury action, but does not claim damages for lost earnings or earnings capacity, evidence of his or her immigration status is irrelevant. (*Rodriguez v. Kline* (1986) 186 Cal.App.3d 1145, 1149 (*Rodriguez*).) Immigration status has no tendency in reason to prove or disprove any fact material to the issue of liability; it does not demonstrate whether the defendant committed a harm-causing act. Immigration status has no tendency in reason to prove or disprove any fact material to the determination of past special damages, i.e., what are the plaintiff's past medical bills up to the date of trial. Nor is evidence of immigration status relevant to general damages, as it does not prove or disprove what is the reasonable amount of money to compensate the plaintiff for his or her past and future pain and suffering. Further, immigration status alone has no tendency in reason to prove or disprove any fact material to the issue of a party's credibility.

Our conclusion is the same with respect to Velasquez's immigration status and his claim that he will require future medical treatment, specifically, a lung transplant. Dr. Ross testified at the 402 hearing only that he would have to "look into the issue" of whether UNOS policy allowed his team to consider immigration status in granting a lung transplant. He never testified he was certain it would or could be considered. And, both

26

party's experts eventually testified that UNOS policies preclude consideration of alienage status in a transplant decision. As such, the evidence was simply irrelevant. When evidence of a plaintiff's immigration status is irrelevant to the issue of whether or not he will receive future medical treatment, it is inadmissible. (Evid. Code, § 350.) In light of these principles, the jurors should not have been informed that Velasquez is an undocumented immigrant.

We understand the trial court did not foresee that Velasquez's immigration status would turn out to be entirely irrelevant, given that at the 402 hearing Dr. Ross initially indicated he was uncertain whether UNOS would allow its consideration, and he only clarified that it could not be considered when he testified at trial. Though the non-discrimination policy became effective in September 2012, before Dr. Ross testified at the 402 hearing on October 3, 2012, apparently he was unaware of the new policy at that time.[9]

But even before the experts clarified the UNOS policy, we believe the trial court abused its discretion in determining Velasquez's alienage status was admissible under Evidence Code section 352, and the jury should not have been informed of it. From the start, Dr. Ross's testimony that he would have to find out whether UNOS and UCLA took alienage status into account was – at best – only nominally relevant. As we have noted, Dr. Ross's testimony did not establish that Velasquez would be disqualified for a lung transplant at UCLA. Further, Dr. Ross did not testify whether hospitals across the United States consider alienage status in the decision to grant a lung transplant. Moreover, Dr. Ross's testimony did not provide any information concerning lung transplant availability in any other country.[10] On the other side of the scale, the trial court

---

[9]      Advanced's expert likewise agreed that alienage status had no effect on the likelihood of receiving a lung transplant.

[10]      The dearth of information on the availability of a lung transplant outside of UCLA may have been due to the fact that the issue of immigration status was peripheral to the overall purpose of the section 402 hearing at its inception, which was the "need" for a transplant.

correctly recognized the potential prejudice in admitting evidence of Velasquez's immigration status was very real, and very strong. The trial court noted more than once that, but for the probative value of the evidence of immigration status on the issue of the likelihood that he would receive a lung transplant, it would not admit what it considered "highly prejudicial" evidence of Velasquez's immigration status.

As Velasquez and the amici parties accurately point out, cases both in California and in multiple other jurisdictions have recognized the strong danger of prejudice attendant with the disclosure of a party's status as an undocumented immigrant. (See, e.g., *Hernandez v. Paicius* (2003) 109 Cal.App.4th 452; *Rodriguez, supra,* 186 Cal.App.3d 1145; *Salas v. Hi-Tech Erectors* (2010) 168 Wash.2d 664 [230 P.3d 583]; *Republic Waste Services, Ltd. v. Martinez* (Tex.App. 2011) 335 S.W.3d 401; *Maldonado v. Allstate Ins. Co*. (Fla.App. 2001) 789 So.2d 464; *Klapa v. O & Y Liberty Plaza Co*. (1996) 168 Misc.2d 911 [645 N.Y.S.2d 281]; *Gonzalez v. Franklin* (1987) 137 Wis.2d 109 [403 N.W.2d 747]; *Peterson v. Neme* (Va. 1981) 281 S.E.2d 869.) In such cases, reviewing courts have found that rulings to exclude evidence of a party's immigration status were not error, or that admitting evidence of a party's immigration status was error because the evidence was irrelevant to any material issue or because it was only marginally relevant to any material issue, and that the error justified reversal. We agree.

We find the trial court abused its discretion in determining the evidence was admissible under Evidence Code section 352. The court overweighed the probative value of the evidence of immigration status on the question of whether Velasquez could feasibly argue he expected to require, and to receive, a lung transplant in the future. The evidence did not show that, because of his immigration status, Velasquez would be foreclosed from receiving a lung transplant, if one was necessary.

In summary, whether examined as an issue of total inadmissibility for want of relevance under Evidence Code section 350, or as a matter of discretionary exclusion under Evidence Code section 352, the trial court erred when it ruled that Velasquez's immigration status could be presented to the jurors. Thus, it erred by informing the jurors of Velasquez's immigration status during voir dire.

## III. The Trial Court Erred When it Denied the Motions for Mistrial

Velasquez contends the trial court erred in denying his multiple motions for a mistrial, "especially upon recognizing that [his] residency status was irrelevant." We agree.

### *The Law*

It is well-settled that a trial court has the discretion to declare a mistrial when "an error too serious to be corrected has occurred." (*Petrosyan v. Prince Corp.* (2013) 223 Cal.App.4th 587, 593; *Abbott v. Mandiola* (1999) 70 Cal.App.4th 676, 682.) Among the recognized grounds for a mistrial are " 'any . . . irregularity that either legally or practically prevents . . . either party from having a fair trial.' " (*Clemente v. State of California* (1985) 40 Cal.3d 202, 217.) Whether a particular trial incident has incurably damaged a party's right to a fair trial is by its nature largely a qualitative matter requiring an assessment of the entire trial setting. For this reason, trial courts are vested with wide discretion in ruling on mistrial motions. (*Blumenthal v. Superior Court* (2006) 137 Cal.App.4th 672, 679.) The trial court, "present on the scene, is obviously the best judge of whether any error was so prejudicial to one of the parties as to warrant scraping the proceedings up to that point." (*Id.* at p. 678, italics omitted.) A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged. (*Id.* at p. 679.)

### *Analysis*

From the earliest stages of trial, even before voir dire of the jurors began, the trial court openly recognized the strong risk of prejudice inherent in evidence of Velasquez's immigration status. At a pretrial status conference, during a discussion with the lawyers

29

about the then-pending motions in limine regarding the immigration status issue, the court made the following comments: "If it weren't for the need of the lung transplant, I would just exclude all evidence about his alienage status and that would be the end of it. [¶] I think it's clear under Evidence Code [section] 352 it would be unduly prejudicial." The court's concern was not assuaged even as it ruled at the initial section 402 hearing that evidence of Velasquez's immigration would be admissible. At that time, the court expressly acknowledged that evidence of Velasquez's immigration status was "highly, highly prejudicial," but concluded that its probative value in Velasquez's case was "definitely more than a little."[11] Later during trial, as cross-examination of Velasquez was about to begin, the court directed Advanced's counsel not to question Velasquez "about citizenship." This led to another exchange between the court and Velasquez's counsel about the disclosure of Velasquez's immigration status by the court. During that exchange, the court stated that it understood the concern expressed by counsel, and continued: "Beside beating my chest, you know, for mercy, what do you want me to do?" When Velasquez's counsel suggested it grant his motion for mistrial, the court denied the motion.

The trial court correctly assessed the prejudice inherent in informing the jury of Velasquez's immigration status. Further, the trial court was correct in the ultimate ruling that evidence of Velasquez's immigration status was irrelevant on the issue of his possible future medical treatment. Overall, the record shows, without room for meaningful dispute, that the court recognized at all times during the trial proceedings that there was a risk of undue prejudice from this evidence, but nevertheless initially determined there was a counter-balancing reason for admitting the evidence. Once the court determined that this counter-balancing reason for admitting the evidence did not exist, the only remaining weight on the scales was on the side of the strong inherent risk of prejudice from the evidence. Having already informed the jurors that Velasquez was

---

[11]   As discussed above, the record shows the court subsequently changed its view and found the evidence had no value.

an undocumented immigrant we are amply satisfied that, at this juncture, the trial court should have declared a mistrial.

We find the error prejudicial.[12] Advanced asserts, and we agree, that the appropriate standard of review is to determine whether a result more favorable to the appealing party would have been reached in the absence of the error. Here, the critical issue decided by the jury was causation. The jury voted nine to three that Advanced's acts were not a substantial factor in causing harm to Velasquez. Our task is to determine whether we believe this same result would have occurred in the absence of the trial court's disclosure of Velasquez's immigration status. Because we find it reasonably probable Velasquez would have obtained a more favorable verdict absent the error, particularly with respect to the jury's causation finding, we find reversal is warranted.

As noted above, David Egilman, M.D., testified on Velasquez's behalf on the issue of whether diacetyl caused Velasquez's bronchiolitis obliterans. Although Dr. Egilman's testimony suffered from weaknesses, including a significant amount of impeachment concerning his expert testimony in an earlier case, we do not find his testimony to have been so underwhelming that it necessarily explains the jury's causation findings. Brent Findley, Ph.D., testified on behalf of Advanced on the issue of causation, focusing more broadly on the then-existing state of ongoing scientific research on the subject of whether diacetyl causes bronchiolitis obliterans. Dr. Findley's testimony explained that the research had not yet reached any actual conclusions concerning a causal link between diacetyl and bronchiolitis obliterans, thus refuting Dr. Egilman's assertions that the research did show such a link. However, Dr. Findley also acknowledged that ongoing research into the subject was scientifically warranted. We cannot conclude that Dr. Findley's testimony was so strong that it necessarily explains the jury's' causation findings.

---

[12]   We decline to find this error structural, or reversible per se. Velasquez has not presented us with suitable authority to support this argument.

31

Apart from the competing expert testimony, there was extensive evidence at trial regarding the shortcomings of Velasquez's employer, Gold Coast, regarding safety in the workplace. Further, there was evidence showing that Velasquez did not follow workplace safety rules. All of this evidence was certainly admissible to show multiple possible factors in the cause of Velasquez's health problems. But, we must acknowledge that Velasquez's immigration status could have affected the jurors' assessment of causation. A juror could have concluded that Velasquez would never have gotten sick but for working at Gold Coast, which should never have occurred because he was in the country illegally. In other words, the causation issue in this case is difficult to divorce from the issue of immigration status. When all of the evidence is taken into consideration, we find it reasonably probable that a result more favorable to Velasquez would have been reached in the absence of this error.[13]

## V.      The Negligence Cause of Action

In its respondent's brief on appeal, Advanced argues that no alleged defect in the jury's special verdict supports reversal of the trial court's order granting the company's motion for nonsuit on Velasquez's cause of action for common law negligence. As the company correctly notes, the court ruled nonsuit was proper because Velasquez failed to present any evidence during trial on the standard of care in the food flavoring industry at the time Velasquez was exposed to Advanced's diacetyl, a required element for a cause of action for common law negligence.[14] We see no argument in either Velasquez's opening brief on appeal or his reply brief explaining that he did present evidence on the

---

[13]      Having determined that the trial court erred in denying Velasquez's motion for mistrial, and that the error warrants reversal, we do not reach his remaining claims of error on appeal.

[14]      As noted above, the trial court granted nonsuit after the jury's special verdict, but before entry of judgment. Given the timing, the ruling in substance may be viewed as granting judgment notwithstanding the verdict on Velasquez's cause of action for common law negligence. The power to grant a judgment notwithstanding the verdict is "absolutely the same" as the power to grant a nonsuit. (See *Beavers v. Allstate Ins. Co.* (1990) 225 Cal.App.3d 310, 327.)

standard of care.  Accordingly, we agree with Advanced that the trial court's nonsuit ruling should remain intact.

## DISPOSITION

The judgment is reversed except as to the trial court order granting Advanced's motion for nonsuit on the common law negligence cause of action.  The case is remanded to the trial court for further proceedings consistent with this opinion.  Appellant is awarded costs on appeal.

**CERTIFIED FOR PUBLICATION**


BIGELOW, P.J.

We concur:


RUBIN, J.



GRIMES, J.


33