Filed 3/16/21  P. v. Rios CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CESAR FERNANDO RIOS,<br><br>    Defendant and Appellant. | B300941<br><br>(Los Angeles County<br>Super. Ct. No. PA091352) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Cynthia L. Ulfig, Judge.  Affirmed.

Ambrosio E. Rodriguez for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Gary A. Lieberman, Deputy Attorney General, for Plaintiff and Respondent.

————————————

A jury convicted Cesar Fernando Rios of several sex crimes for molesting his stepdaughter for several years starting when she was 11.  Rios maintains we should overturn his convictions because the trial court should have allowed him to explore his stepdaughter's immigration status before the jury.  He also claims ineffective assistance of counsel.  We affirm the judgment because Rios's contentions lack merit.

I

We recount the trial testimony, omitting the family members' names to protect the victim's anonymity.  (Cal. Rules of Court, rule 8.90(b)(4) & (11).)

Rios's stepdaughter testified first.  She came to the United States from El Salvador in 2008 when she was 10 years old and moved into a house in Sun Valley, California with her mother, her younger sister, and Rios.  Rios was her mother's boyfriend, and the couple was pregnant with a son around this time.  The stepdaughter met Rios when she moved in with him.

The stepdaughter described how Rios began molesting her. When she was 11 years old, Rios put his hand under her bra and touched her breast.  She had been massaging Rios in their living room.  Rios "always asked" for a massage.  When Rios touched her breast, she did nothing and "[p]retended like it wasn't happening."

The next day, in Rios's truck, he put his fingers in her vagina.  Rios rubbed her thigh and said, " 'When you're a little girl you didn't feel anything.  Now that you're older, you're starting to feel things.  You feel tickles.' "  Rios instructed his stepdaughter to tell no one.  She obeyed.

After this incident, the family moved to a two-bedroom apartment in Panorama City.  Later, they moved to another two-

2

bedroom apartment.  In these apartments, Rios, the mother, and their son shared one bedroom; the stepdaughter and her sister shared the other.

Rios's touching continued at the apartments.  The stepdaughter testified he touched her vagina and breasts.  Then she began touching Rios—"[h]is penis, his chest, everywhere."  This happened often, when her mother was not around.

The touching led to oral sex when the stepdaughter was still 11 years old.  She testified Rios "put his penis on my mouth and then we did that for a bit."  This happened more than twice.

Rios grew bored with oral sex and asked if he could "put it in."  When his stepdaughter was 12 years old, Rios had sexual intercourse with her in his bedroom.  She knew she was 12 when it happened because "I told myself that I couldn't believe that is how I lost my virginity and I didn't do anything about it."  She was mad at herself for allowing it to happen.

The sex became frequent and stayed that way until the stepdaughter was 16 years old.  She testified it happened almost every weekend, when her mother worked and Rios remained home with the children.  Her mother worked weekend evenings from around 9:00 p.m. to 2:00 a.m.

The stepdaughter would dress differently—"more provocative, more sexually"—for Rios when her mother was at work.  And he would make her take a shower before sex.  Sometimes he would ejaculate inside her vagina and sometimes outside it.  Rios would give her a pill so she would not get pregnant.

As she got older, Rios would only let her go out if she had sex with him.

At some point, they started having anal sex. This happened more than twice.

The sex happened in Rios's bedroom. Early on, Rios's son would be asleep in the room, and the bedroom door would remain open. Then they started locking the door. The sister would knock, but they would not open it. Later on, the stepdaughter would give her sister a phone to keep her busy. Her sister is four years younger.

The stepdaughter came close to telling her sister what was happening at least twice. The girls would talk privately in their bedroom closet. The stepdaughter told her sister she had a "big secret" that would "destroy the whole family." She never revealed the secret. Rios warned if she told anyone what was happening, he would take her brother away and blame her.

In 2014, when the stepdaughter was 16 years old, she moved to Denver to get her diploma; she had dropped out of high school in Los Angeles. She would be at school for three months, come home for one month, and then go back to school again. Rios continued to have sex with her when she returned home. She was 17 years old the last time they had sex.

While away at school, the stepdaughter wrote a poem about her life that "triggered" her and prompted her to tell a school counselor of Rios's abuse. She was 18 years old at the time. The counselor notified the police.

The stepdaughter did not want to call the police because she loved Rios and did not want to destroy her family. She felt she was in a relationship with him. Rios would tell her they would go away together once she turned 18.

The sister testified next. Her testimony corroborated the stepdaughter's testimony.

4

She remembered her sister and Rios would go into his bedroom almost every weekend and lock her out. She unsuccessfully would try to open the door. She did not know why they kept her out of the room and thought they did not like her.

Rios was "never gone" on weekends. But her mother worked weekends, leaving around 8:00 or 9:00 p.m. and returning around 1:00 or 2:00 a.m. Her mother went back to work within a few months of giving birth to her brother. She remembered her sister would dress differently after her mother left for work.

A couple times, while talking in their closet, her sister mentioned she had a secret that would break up their family. She never learned the secret.

The sister testified Rios punished her brutally. He would shave her eyebrows, cut her hair, make her wear dirty clothes to school, and make her sleep outside in a shed. Rios never did anything like this to her sister.

The People rested after the sister testified, and defense counsel orally moved to dismiss the case for lack of evidence. The trial judge denied the motion, commenting she "must have seen a different trial" because she found both girls credible.

The defense then called the apartment managers for the family's two apartments. One manager testified she frequently looked for Rios at his apartment because he was behind with rent, but she "could almost not find him because he was working." She almost never saw him on the security camera, and his car almost never was there.

The manager for the second apartment complex testified Rios lived there with his wife, one daughter, and one son. It appeared to her the other daughter (the stepdaughter) moved in close to a year later.

Rios's boss testified next. He employed Rios as an independent contractor from at least 2009 to 2014, first repainting and refurbishing Chase banks throughout California and then doing other construction work. He estimated that, in a typical month between 2009 and 2012, Rios would be out of town working at least 18 to 20 days, mostly on weekends when the banks were closed. Rios continued to do work for him on nights and weekends between 2012 and 2014. He estimated Rios was out of town working at least 250 nights of the year in both 2012 and 2013. He conceded he was not always on site with Rios. He and Rios still worked together and were friendly at the time of trial.

The boss testified Rios should have tax returns showing the time he worked. He had emails indicating where Rios was supposed to work but nothing detailing where Rios actually was working.

Rios was the last defense witness. He denied having sex with his stepdaughter. On cross-examination, he admitted telling police she would massage him—his arms, shoulder, and legs from the knee down. He later admitted telling police his stepdaughter snuck into his room while he was asleep and massaged his penis. This happened four times.

Rios told the police his stepdaughter exposed her breasts and vagina to him when she was under the influence of alcohol and drugs. He told them she was trying to seduce him and made him uncomfortable. He said she was the one asking to run away with him when she turned 18. (The stepdaughter later returned to the stand to deny this claim.)

Rios testified his wife did not work for four and a half or five years after their son was born in 2009. He denied ever being

6

home with the kids without her. He maintained he was out of town a lot for work between 2009 and 2014 and frequently worked weekends and nights. Rios estimated he slept away from home three weeks of every month from 2010 to 2013. But on cross-examination, Rios admitted he told police his work was slow for several years, as everything in construction "was going down."

Rios denied punishing the younger sister as she described.

He tried to paint the stepdaughter as a disobedient, out-of-control teen. He claimed she ran away from home in 2012 for six to eight months. (The stepdaughter testified she ran away for about a week when she was 15.) Rios testified that, after she started school in Colorado, he told her she could not come home; he claimed she endangered the family when she brought home a drunk male. Rios implied his stepdaughter retaliated by going to the police with allegations of sexual abuse.

The People called two detectives as rebuttal witnesses to clarify statements the stepdaughter made to police about Rios, why it took so long to arrest Rios after the stepdaughter reported the crimes, and what Rios told police in jail. The detective who interviewed Rios said Rios assumed his stepdaughter was the one accusing him of sexual abuse. Rios said she was "super obsessed" with him; she would put on his wife's clothing when his wife was at work to "provoke" him; and he was aroused when she snuck into his room and touched his penis, but he did not have sex with her. Rios never told the detective about being gone a lot between 2009 and 2014, and he implied the opposite by insisting he had sex with his wife about once a week. He told the detective his wife worked a couple nights a week; he would stay home with the

kids then.  Work was scarce for him for about five years around the time of his son's birth.

The jury returned a verdict in about an hour.  It convicted Rios of three counts of committing a lewd act on a child (Pen. Code, § 288, subds. (a) & (c)(1)), and one count of continuous sexual abuse (*id.* § 288.5, subd. (a)).

The trial court sentenced Rios to a total term of 19 years, four months in state prison.

## II

On appeal, Rios contends the trial court abused its discretion and violated his constitutional rights in prohibiting his counsel from inquiring into the victim's immigration status.  Rios also claims he received ineffective assistance of counsel.  We reject each contention.

## A

Rios argues the trial court should have let his counsel explore on cross-examination whether the possibility of obtaining immigration benefits through the U visa process provided the stepdaughter a motive to lie.  He claims the court erroneously prevented him from establishing a full picture of the victim's potential motives and biases in a case that hinged on her credibility.

The court's ruling was proper, as counsel offered only speculation to justify this invasive questioning.

At trial, outside the jury's presence, the deputy district attorney told the court she anticipated defense counsel would raise the issue of the stepdaughter's immigration status and asked the court to exclude it.  The attorney believed the girl would voluntarily testify she came from El Salvador, as this fact anchored when she met Rios.

Defense counsel responded he might inquire about this issue and argued as follows, with our emphasis:

"[I]t might be motivation for her to fabricate. *It is my belief and I'm informed that she is in the country illegally. That in and of itself doesn't have any relevance in this trial*, however, if that caused her to fabricate in any way, then I believed that would be relevant in this trial.

Being the victim of a crime could be grounds to get a new visa. *I don't know if that happened in this case.* I think that it is a fair area of inquiry and with the election of President Trump and changes in immigration policy, someone who is here unlawfully might have serious motivation to—motivation to lie about being the victim of a crime for purposes of gaining lawful status or residency here."

While unclear, it appears counsel was arguing he should be allowed to explore whether the stepdaughter had a motive to incriminate Rios to obtain favorable immigration treatment through the U visa program. The U visa is a "temporary nonimmigrant visa created by Congress to provide legal status for noncitizens who assist in the investigation of serious crimes in which they have been victimized." (*People v. Morales* (2018) 25 Cal.App.5th 502, 506; see also 8 C.F.R. § 214.14 (2020) [describing U visa requirements].)

The trial court ruled counsel could not inquire as to the immigration status of the alleged victim or any witness, as such an inquiry was irrelevant and more prejudicial than probative. However, the court would permit questioning concerning when and from where the victim came to the United States.

The trial court's ruling was not an abuse of discretion.

Defendants generally are entitled to explore a witness's bias, including whether the witness has been offered an inducement or expects a benefit for testimony. (*People v. Pearson* (2013) 56 Cal.4th 393, 455 (*Pearson*).) But a defendant's right to cross-examine is not absolute. (*Ibid.*)

Some statutes require the exclusion of certain impeachment evidence. (See Evid. Code, § 780, italics added ["*Except as otherwise provided by statute*, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, . . ."].) And trial courts have substantial discretion to exclude collateral evidence offered to attack witness credibility. (*People v. Thornton* (2007) 41 Cal.4th 391, 428.) We review such rulings for abuse of discretion. (*Ibid.*)

We assume counsel's requested inquiry into the stepdaughter's immigration status was relevant. But two statutes convince us the trial court did not err in precluding this inquiry: Evidence Code sections 352 and 351.4. Under section 352, the trial court has discretion to exclude evidence that may involve undue prejudice, confusion, or time.

Section 351.4, which became effective more than a year before Rios's June 2019 trial, prohibits the disclosure of a person's immigration status in open court unless the party seeking disclosure requests an in camera hearing and the judge determines the evidence is admissible. The legislature thus recognized the prejudicial nature of the inquiry Rios sought here. Courts appreciate the danger as well. (See, e.g., *Velasquez v. Centrome, Inc.* (2015) 233 Cal.App.4th 1191, 1213 [listing

10

California and out-of-state cases recognizing "the strong danger of prejudice attendant with the disclosure of a party's status as an undocumented immigrant"].)

Here, Rios's trial counsel conceded the stepdaughter's immigration status was a collateral matter that "in and of itself doesn't have any relevance in this trial." Counsel then speculated the stepdaughter could have a reason to lie based on his understanding of her status, the potential for a new visa, and today's political climate. Counsel did not request an in camera hearing to present evidence and made no offer of proof supporting this theory. He identified no evidence of the stepdaughter's status, no evidence she sought any benefit associated with the U visa program, and no evidence she was aware of the program.

Only speculation supported Rios's bid to suggest to the jury potentially available benefits of a U visa provided his stepdaughter a motive to fabricate years of sexual assault at his hands. The trial court's ruling was reasonable and proper. (See *People v. Villa* (2020) 55 Cal.App.5th 1042, 1053–1054 (*Villa*) [recognizing the danger that jurors who learn of a victim's undocumented status would view the victim unfavorably or oppose convicting if they thought it was tantamount to granting the victim permanent status].)

The risk of undue consumption of time buttressed the court's ruling. (See *Villa, supra*, 55 Cal.App.5th at p. 1053 [once raised, the parties would need to educate the jurors about the U visa program through expert testimony and may put on additional witnesses to testify regarding when and what the victim learned about the program and the status of any application].)

11

Rios cites cases in which courts approved questioning on this issue, including an unpublished case, which violates the Rules of Court. (Cal. Rules of Court, rule 8.1115.) But neither this case nor the others support Rios's position, as in each case there was an offer of proof the witness had asked about or applied for a U visa before trial or knew the impact of her testimony on a family member's pending U visa application. (See *People v. Hernandez* (Aug. 6, 2019, G056051) [nonpub. opn.]; *Romero-Perez v. Commonwealth* (Ky.Ct.App. 2016) 492 S.W.3d 902, 904, 906; *State v. Del Real-Galvez* (Or.Ct.App. 2015) 346 P.3d 1289, 1291–1293.)

The trial court properly prevented defense counsel from pursuing this speculative line of inquiry before the jury.

B

In one sentence of his opening brief, Rios asserts the court's ruling also violated his constitutional rights. This inadequate presentation forfeits this argument.

Moreover, the argument is invalid on the merits. A criminal defendant's right to confront witnesses is not absolute and may bow to other legitimate interests, including Evidence Code section 352 concerns. (*People v. Brown* (2003) 31 Cal.4th 518, 538, 545.) As explained above, the trial court acted within its discretion in precluding any inquiry into the stepdaughter's immigration status under this provision.

Additionally, in light of the inadequate offer of proof at trial, Rios failed to establish the prohibited examination would have produced a significantly different impression of the stepdaughter's credibility. (See *Pearson, supra*, 56 Cal.4th at pp. 455–456.)

12

The trial court's ruling regarding the stepdaughter's immigration status did not violate Rios's constitutional rights.

## C

Turning his attack to his trial counsel, Rios argues counsel was ineffective in failing to investigate the stepdaughter's immigration status, failing to obtain documents corroborating Rios's testimony, and failing to call a crucial witness—the stepdaughter's mother.

Rios did not demonstrate his trial counsel's representation was deficient.

To establish ineffectiveness, a defendant must show counsel's efforts fell below an objective standard of reasonableness and the deficient performance prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688.) In reviewing ineffective assistance claims, we defer to counsel's reasonable tactical decisions and presume counsel acted within the wide range of reasonable professional assistance. (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

Typically, claims of ineffective assistance are more appropriately raised in habeas corpus proceedings. (*Mai*, *supra*, 57 Cal.4th at p. 1009.) On direct appeal, we reverse a conviction only if (1) the record shows counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) no satisfactory explanation could exist. (*Ibid.*)

As explained below, Rios has established no basis for reversal.

### 1

On the immigration issue, Rios says nothing shows his trial counsel inquired regarding the stepdaughter's immigration

status before trial.  But the record does not establish what steps counsel took or failed to take to investigate the matter.  It is Rios's burden to establish deficient performance.  He has failed.

The record does show counsel investigated enough to form a belief as to the stepdaughter's status and had pursued this issue with the prosecution before trial, as the deputy district attorney signaled to the trial court.

2

On the issue of corroborating documentation, Rios complains his trial counsel should have obtained work-related documents to bolster Rios's testimony.  But the record does not disclose whether counsel tried to get such documentation or whether it was accessible.  We have no information about counsel's investigative steps.

Nor does the record disclose whether the documentation would have supported Rios and his boss's accounts of Rios's work history.  A logical explanation is it did not.  (See *People v. Jimenez* (1992) 8 Cal.App.4th 391, 397–398 [record did not disclose why defense counsel did not offer certain evidence, but the logical explanation is there was no exculpatory evidence to present].)  Further, Rios's boss admitted he had nothing showing where Rios actually worked, so obtaining the boss's emails would have been little help to Rios.

Rios briefly mentions the stepdaughter's medical records and argues counsel could have used these to show the girl never reported the abuse to her doctor.  The stepdaughter testified she did not tell anyone about the abuse before telling her school counselor.  This investigation could only have confirmed the prosecution's case.

3

Regarding counsel's failure to call the stepdaughter's mother to testify, the record discloses both a tactical purpose and a satisfactory explanation for this decision. During closing argument, defense counsel tried to sow doubt about the People's case by emphasizing the People did not call the mother to testify when she worked. Counsel's belief that the mother's absence from trial favored the defense was not unreasonable, as one might expect a mother to side with her daughters over an ex-partner who allegedly sexually abused one of the daughters.

Rios assumes his trial counsel failed to investigate this witness. But nothing in the record shows counsel failed to contact, interview, or investigate the mother. This case is unlike *People v. Bess* (1984) 153 Cal.App.3d 1053, on which Rios relies, where the record disclosed helpful eyewitnesses to a robbery were willing to be interviewed by the defense but were neither interviewed nor called at trial. (*Id.* at pp. 1059–1060.)

Rios also assumes the mother's testimony about when she worked would align with his testimony and not the daughters' testimony. But there is nothing in the record to suggest her testimony would have been exculpatory. We may not assume from a silent record that a witness was "ready, willing and able to give mitigating testimony, nor can we speculate concerning the probable content or substance of such testimony." (*People v. Medina* (1995) 11 Cal.4th 694, 773.)

4

Rios argues his counsel had a duty to undermine the stepdaughter's credibility and implies counsel shirked this duty. But both Rios and his trial counsel attacked her testimony and credibility from all angles.

15

Several times at trial, in response to his counsel's questioning, Rios said his stepdaughter's testimony was untruthful.

When cross-examining the stepdaughter, counsel tried to undermine her memory of when she moved in with Rios, when her mother was pregnant, when her mother went back to work, and when Rios was home.

Counsel also tried to suggest the stepdaughter embellished her trial testimony by repeatedly noting she testified about things she never told police when interviewed closer in time to the alleged abuse.

Counsel called four witnesses to contradict her.

Despite counsel's continual efforts, both the trial court and the jury found credible the testimony of the stepdaughter and her sister.

Rios has not demonstrated his trial counsel was ineffective.

## DISPOSITION

We affirm the judgment.


WILEY, J.


We concur:


GRIMES, Acting P. J.          STRATTON, J.