[Civ. No. 30852. Second Dist., Div. One. May 22, 1967.]

Adoption of SCOTT JAMES RICHARDSON, a Minor. WAYNE HARBRO CHRISTENSEN et al., Plaintiffs and Appellants, v. LOS ANGELES COUNTY BUREAU OF ADOPTIONS, Defendant and Respondent.

Ivan E. Lawrence for Plaintiffs and Appellants.

Robert M. Werdig, Jr., and Charles J. Brown as Amici Curiae on behalf of Plaintiffs and Appellants.

Harold W. Kennedy, County Counsel, and Wayne R. Parrish and Ronald Aubert, Deputy County Counsel, for Defendant and Respondent.

FOURT, J.—This is an appeal "from the decree denying adoption entered July 5, 1966, and from the denial of both Motion for New Trial, and, (in the Alternative), Motion to Vacate a Decree and to Enter Another and Different Decree denied in Court July 19, 1966." The appeal, in effect, is from the denial of the petition of Madeline Marie Christensen and Wayne Harbro Christensen for the adoption of Baby Boy Richardson, and removal of the subject minor from the homes of petitioners-appellants and commitment of the child to the Los Angeles County Bureau of Adoption, pursuant to section 226c of the Civil Code. The minute entry of the court dated June 29, 1966, states that the petition was "denied in the best interest of the child" and that it was directed that the child be delivered to the Bureau of Adoptions. The decree denying the petition, signed the next day, June 30, 1965, states that the "denial is specifically based on the finding that the home

of . . . [petitioners] is not a normal home, and that the welfare of the child will best be served by the denial of the petition.''

A résumé of some of the facts and some of the procedural background of this case is as follows: Wayne and Madeline Christensen, 46 and 41 years of age respectively, and married 17 years, sought to adopt the child here involved. Wayne is prelingually deaf (unable to hear or speak) and Madeline is deaf but can speak and be understood to a limited degree. They cannot have children of their own. Wayne is now, and has been, steadily engaged as a drill press operator for the same employers for over 11 years with a take-home pay of about $98 per week. He has a $5,000 life insurance policy on his life and $7,000 mortgage insurance which will practically pay off the indebtedness on his home in the event of his death. The Christensens have a $17,000 equity in a comparatively new three-bedroom home, own two automobiles and have a modest savings account. Wayne has been a licensed car driver for 28 years.

The Christensens have been very active in the Church of Jesus Christ of Latter Day Saints (Mormon). That church has a branch for the deaf where Wayne is an active member and where he has been superintendent of the Young Men's Mutual Improvement Association for 10 years and a clerk of the Southern California Deaf Branch of the Church for five years, with the duty, among others, of keeping careful type-written records of all church activities.

Madeline is not employed for compensation outside the home, but she also is active in the church affairs. She was president of the Young Women's Mutual Improvement Association, the secretary to the Relief Society for a year and its president for three years.

In 1962 the Christensens brought Janett Cornell, a two-year old girl, into their home with the written consent of her parents and they have reared her to the present date. Janett's parents are deaf and she has lived practically her entire life in the homes of deaf persons. On November 4, 1966, in the Superior Court in Los Angeles County, the Christensens were appointed the guardians of Janett with no hesitation or qualification. The guardianship was approved by the natural parents and maternal grandmother. Janett was unable to talk when originally placed with the Christensens. However, now at the age of six she speaks with others, communicates in sign language, talks and plays with all the normal neighbor chil-

dren, is normal in every respect and is described by Doctor Neil V. Litman[1] as being a bright, charming and vivacious child; Doctor Litman states that everybody in his "office loves her" and that frequently she acts as the interpreter between the Christensens and himself. When Janett attends church functions with the Christensens, she participates with other hearing and speaking children where she is taught by speaking and hearing teachers.

On August 30, 1965, the Christensens received custody of Scott James Richardson, who was then two days old. On September 1, 1965, they filed a petition for adoption of the baby Scott. Scott's natural mother, prior to the birth of the child, was told of the Christensens' deafness, their ages, church associations, economic circumstances and inability to have natural children. The natural mother selected the Christensens from among several prospective parents; she did not want the child. The child was conceived in an illegal relationship. Proper written consents of the father and of the mother of Baby Scott to the proposed adoption by the Christensens were made and executed and were filed in the proceedings. During the nine-month period when Baby Scott was with the Christensens, he developed normally. The expert pediatrician, Doctor Litman, who had cared for the child, stated that the development was normal, that the child had received treatment of his minor childhood illnesses at the proper times and had received the usual immunizations; that when he dealt with the Christensens he was "dealing with intelligent parents who are handling their child wonderfully."

The child welfare worker (Mrs. Barr) assigned by the bureau to the case made three reports. In a progress report dated January 21, 1966, she stated that petitioners "appear to be suitable," that the doctor had reported with reference to some question about the neurological development of the child and desired a further observation. The bureau recommended that the child continue in petitioners' home while his devel-

---

[1] A qualified specialist in pediatrics who has examined some 5 to 10 thousand children a year—a full professor of pediatrics at U.C.L.A. School of Medicine, past president Los Angeles Pediatric Society, member of the Governor's Advisory Committee of Crippled Childrens Program and numerous national organizations involving the same subject matter. He has had considerable experience with deaf people and had known the Christensens for some time and had seen and cared for the baby subject to adoption since September 1, 1965, when the child was four days old. It is to be noted further that in testifying as an expert in this matter the doctor was doing so without fee for such services.

opments were further evaluated. In a supplemental report made on February 23, 1966, the bureau set forth the circumstances of the proposed adoption and placement; further, the report related that at a subsequent examination of the child he was responsive, that the child was getting care and that the petitioners "were functioning well as parents." It was pointed out that the petitioners were going to take the child to a neurological specialist for a full evaluation of his condition. The report described the excellent conditions of the Christensen home, their church activities and other related matters. It was noted that the petitioners had an excellent reputation among people who had known them for years. It was therein described how an electronic device had been installed to the end that if the child needed anything in the nighttime, the petitioners could be alerted and could respond as needed. Also, it was pointed out that petitioners were rearing Janett in such a manner that she was developing normally, that "[t]he petitioners appear to have made an excellent adjustment to life despite the handicap of no hearing or speech, evidencing a stability in their marriage and in the man petitioner's case, in his job. They appear well able to function as parents which is borne out by the apparently good adjustment of the five year old left in their care. The petitioners appear to be a warm and sensitive couple. They share interests in camping, fishing, traveling, and their home." and that the bureau "is of the opinion that the home of the petitioners is suitable, the minor is now legally free for adoption, however, there is some question as to the neurologic development of the minor" and that the cause should be continued to obtain further information on the health problem of the child.

In the report dated April 27, 1966, it is related that the child had been examined by Doctor Arthur H. Parmelee, Jr., a neurological specialist at the U.C.L.A. Medical Center, and the conclusion of that doctor was that the child was performing at a five-month level (he was then seven months old) and that this lag in development was possibly because he was five to six weeks premature. Further it was reported that Doctor Litman had again examined the child on March 12, 1966, and that the child "seems in all respects to be a normal child." The child had an alert and responsive appearance, that he was receiving good physical care and was "much-loved and wanted by the petitioners." The bureau stated that the home is suitable and recommended "with reservations, that the

petition . . . be granted." Attached to the report were the statements of Arthur H. Parmelee, M.D. and Neil N. Litman, M.D. The former set forth, "I would encourage these people to keep this child." The latter set forth that the child had made considerable progress in his neurological development and that "Dr. Parmelee at UCLA agrees with me that the child has now caught up and is performing normally for his age. Both of us feel that his relative retardation noted earlier was related to his premature birth weight, and now feel that the prognosis is excellent. Without qualifications we recommend that this child be adopted by the Christensen family."

On June 6, 1966, the cause came on for hearing. The record relates as the first words of the judge, "I am rather concerned about this case. I can't go through with it." The judge then indicated that he had written a letter in January 1966, to the Bureau of Adoptions with reference to the cause. The contents of the letter were not disclosed to petitioners or their counsel. The judge stated that from all of the reports he had received, the petitioners were "wonderful people" but he had to think about the baby and that he had "talked to five different judges about it and three different social workers" and they all had stated that he would be remiss in his duty "to go through with it." Counsel for petitioners indicated his shock at such statements and asked that the matter be continued for further hearing and agreed to have the child examined by any competent authority suggested by the court and to work without fees. Further, counsel stated that he wished he had known of the judge's January letter; the judge replied, "If you had known it, what could you have done? Do you think you could have gotten that baby away?" and then indicated something to the effect that he blamed the bureau for not having done something about the matter "right off the bat."

The judge also indicated that if the petitioners could do as much as they apparently had for Janett, that he would like to talk to her (Janett) for "[i]f hey can do that much for the girl, there isn't any reason they couldn't for the boy, but I am very much concerned about it." Counsel stated that he had had no inkling of any contemplated action other than the "recommended approval." He was then instructed by the judge to "get ahold of one individual—that will be enough—who can give me some idea of just how they are going to raise this kid, you see. There isn't any question about their integ-

rity . . . I am satisfied they are fine people." The cause was then continued to June 28, 1966.

On the 28th and 29th of June the further hearing was held. Doctor Litman testified that the child was developing perfectly, normally, and would continue to do so; that to take the child away from the Christensens would be doing the child a disservice.

Joe Brandenberg testified that he and his wife were both deaf, yet they were able to and were rearing three hearing children with no trouble in communications. Other witnesses testified to the same effect. Mrs. Barr, of the bureau, testified that she continued in the recommendation for adoption and by way of explanation of the words "with reservations" in her report, said "[t]he fact that the Christensens have a physical handicap or a deficiency in one of the senses means that they are going to have to work harder at parenthood; the approval was because they were meeting this handicap very well. They had compensated by making that extra effort. They appear to be giving the child excellent care and appear to have a good potential for parenthood." Her testimony was that nothing else was meant by the so-called reservation.

Carlton Pilsicker, the supervising child welfare worker of the bureau, in effect corroborated what Mrs. Barr had stated.

After the testimony was concluded and argument had, the judge said, "Is this a normally happy home? There is no question about it, it is a happy home, but is it a normal home? I don't think the Court could make a finding that it is a normal home when these poor unfortunate people, they are handicapped, and what can they do in the way of bringing this child up to be the type of citizen we all want him to be. . . . Under the circumstances the Court has no other alternative in the case but to deny this petition. . . . I, therefore, will have to make an order denying this petition for the best interest of the child and order the child delivered to the Bureau of Adoptions for suitable placement, . . ." It was then ordered that the child be delivered to the bureau representative at that time.

In short, every report, every word of testimony of the thirteen witnesses, and all of the evidence was in favor of the petitioners and for the adoption. There was no cross-examination by counsel for the bureau of any witness nor was there one word of testimony presented in opposition to the granting of the adoption petition, and the judge then denied the petition.

A motion for a new trial and a motion to vacate the judgment was made. Many affidavits were presented by petitioners in support of the motions.

In the affidavit of Ivan Lawrence, counsel for petitioners and appellants, he states that only after the hearing of the case on June 29, 1966, did he see and read and learn of the contents of the letter of January 27, 1966, which the judge wrote to the director of the bureau wherein the judge stated, among other things, "Again we are confronted with a problem of deaf-mutes wanting to adopt a child. . . . I believe that this should be done immediately, and *this adoption should be nipped in the bud* before these unfortunate people get too attached to the child, as in my opinion, we are not doing right by the youngster in signing and approving an adoption to deaf-mutes. I wish you would follow this through carefully, and let me know as soon as possible what your reaction is.

"Very truly yours,
"A.A. Scott."

(Italics added.)

Mr. Justice Homer Thornberry, of the United States Court of Appeals, Fifth Judicial Circuit, made a declaration to the effect that his parents were neither able to hear nor talk, that his father was a teacher at the Texas School for the Deaf until his death, which was when Homer Thornberry was aged nine years, that his mother taught at the same school until she retired; that "During my lifetime I have known and been closely associated with many deaf persons. Because I was the son of deaf parents, I naturally was closely associated with other children of deaf parents. I have been in their homes many times. I have seen the children grow and develop over the years. I have also had the occasion to meet and know highly successful and worthwhile hearing adults who were the children of deaf parents. Deaf parents, because of their deafness, are more careful about their children than ordinary hearing parents. They exercise an extraordinary care and caution to be certain that they sense any occurrence which might be detected in a routine fashion by hearing parents. Hearing children learn early to communicate with deaf parents. I learned to use my hands in the sign language before I spoke orally. I communicated in early life with my parents, just as hearing children communicate early with hearing parents. This has been true of other similar families I have known. Therefore, I had no trouble at an early age or at

any other time in communicating my needs to my parents. This has also been true in other situations about which I know. Deaf people, because of their own difficult experience, place an unusual emphasis on the need for education. My parents at an early age insisted that I should receive all education available. Even though I was tempted because of economic conditions to abandon my college education, it was my mother who never abandoned a determination that I should complete my education. This is true of every deaf parent I ever knew. I have never personally known of a hearing child with deaf parents who did not grow and develop into a worthwhile and fairly successful person.''

Doctor Arthur H. Parmelee, the director of the pediatrics clinic at the University of California at Los Angeles, declared:

''I find that Scott James Richardson has the normal physical and mental development of a prematurely born infant. He has been given excellent physical care and mental stimulation. I have *no concern* about his future physical and mental development in the family of Mr. and Mrs. Wayne Christenson [*sic*]. A healthy personality is dependent on loving, tender care especially during infancy. This family is providing this type of care. Most communication in the first two years of life between parents and children is through touch and visual expression. Language is a late development and despite language throughout our lives we rely heavily on visual observation of facial expressions and gestures for the evaluation of the emotions and true feelings of others. We know that words can be used to say the opposite of what our true feelings are. This child will always know the true feelings of his parents. I have *no concern* about this child's ability to express his needs to his parents when ill or otherwise in distress. Pediatricians generally rely on facial expressions and gestures of children to judge the nature and location of pain and to diagnose illnesses since children who are ill or hospitalized are often mute through fear or pain. These deaf parents will be more skillful than pediatricians in recognizing the slightest change in behavior or expression of their child. *I am convinced* that Scott James Richardson will learn language well as demonstrated by the *little girl* already in this home. Disruption of the continuity of care of this baby at his present age is critical and could be permanently damaging to him. It is well known that babies manifest their greatest anxiety over separation from their parents in the age

period of eight months to two years. This little boy is now being separated from the only parents he knows. He will go into a temporary foster home where he will try to make new attachments. Then he will be placed in a new home and the emotional separation from this foster home will take place. This sequence of events in this age period can be *devastating* to the development of healthy emotional attachments to people for the remainder of this child's life. It is my considered medical opinion that continuance of custody in the home of Mr. and Mrs. Wayne Christenson[sic] is vital to the best interests of this minor child pending the appeal of this case and that it is in his best interest to remain permanently in this home.'' (Italics theirs.)

Doctor Neil N. Litman declared:

''When this child was approximately four months of age there was a slight concern as to whether the child was developing normally; my judgment was confirmed by that of Dr. Arthur Parmalee, [sic] UCLA Medical Center, Associate Professor of Pediatrics, that the slight concern shown at that time was due to the fact this child was born prematurely. From that point on, the child did develop normally and at the present time is a healthy, fully normal nine month old baby. . . . I have had experience with many thousands of children and specifically with four or five parents who have been deaf. *Without any reservations whatsoever, it is my considered medical opinion as a pediatrician* that the minor *child Scott* will have the *maximum opportunity* for *full and normal physical,* emotional and intellectual maturation that could occur in any home where the parents do not have any hearing or speech impediment. I have never before volunteered to come to court, but in this case I voluntarily ask the Court to consider the evidence presented, that this minor child Scott has developed normally, and will continue to flourish in the home and presence and care of the Christensen family; the child being very sensitive at age nine months has received a *real shock* in being *removed* from this relationship and if this condition persists, will undoubtedly *receive a shock* to its *nervous* and *emotional* development of a *high order.*'' (Italics theirs.)

Hugo F. Schunhoff, with 33 years of experience with education for the deaf declared that ''deaf parents have no greater problems in rearing their hearing children than hearing parents. . . .''

232

Many other declarations of similar purport were filed by persons of outstanding reputation and qualifications.

The motions of petitioners were all denied.

Appellants now contend (1) that the judge was biased, prejudiced and predetermined the cause at least five months before the hearing, (2) that the judge abused his discretion in denying the adoption for there was no evidence in opposition to the petition to adopt, (3) that the judge exceeded his jurisdiction in placing the child with the bureau under the circumstances after denying the petition to adopt, and (4) that the equal protection and due process clauses of the Constitution of the United States are violated by denying an adoption to appellants solely because they are deaf-mutes.

 There can be no doubt that the judge was biased and prejudiced against appellants. He wrote the letter of January 27, 1966, to the bureau director before hearing any of the evidence and clearly indicated his state of mind by saying, ''I believe that . . .*this adoption should be nipped in the bud.* . . .'' (Italics added.) Furthermore, the first words at the hearing on June 6, 1966, by the judge were: ''I am rather concerned about this case. *I can't go through with it.* . . . I wrote to Mr. Heath when this matter first came to my attention way back in January and I told him at that time to do something about it.'' (Italics added.) Also, prior to the hearing the judge said that he had ''talked to five different judges about it and three different social workers. . . . And they all said I would be remiss in my duty as a judge to go through with it.''

Bias equates here with partiality. Here the judge had a fixed opinion of the unfitness of petitioners solely because they were deaf-mutes. He was under some influence which so swayed his mind in one direction as to prevent his deciding the case according to the evidence. This leaning or inclination against all deaf-mutes without regard to their character, abilities and demonstrated fine qualities is inconsistent with a state of mind fully open to conviction which the evidence might produce. One whose opinion is preconceived and expressed in writing with reference to particular persons or situations is obviously inclined to that view, and considerable evidence would ordinarily be necessary before those positively expressed impressions could be removed and his mind restored to the straight line of impartiality. Prejudice imports the formation of a fixed anticipatory judgment as contradistinguished from those opinions which may yield to substantial

evidence. It includes the forming of an opinion without due knowledge or examination, although it does not necessarily indicate any ill feeling. In *Ensher, Alexander & Barsoom, Inc.* v. *Ensher,* 225 Cal.App.2d 318, 322 [37 Cal.Rptr. 327], it is said: "Bias or prejudice consists of a 'mental attitude or disposition of the judge towards a party to the litigation, . . .'"

Code of Civil Procedure, section 170, provides in part as follows:

"No justice or judge shall sit or act as such in any action or proceeding: . . .

"When it is made to appear probable that, by reason of bias or prejudice of such justice or judge a fair and impartial trial cannot be had before him.

"*Whenever a judge or justice shall have knowledge of any fact or facts, which, under the provisions of this section, disqualify him* to sit or act as such in any action or proceeding pending before him, *it shall be his duty to declare the same in open court* and cause a memorandum thereof to be entered in the minutes or docket. It shall thereupon be the duty of the clerk, or the judge if there be no clerk, to transmit forthwith a copy of such memorandum to each party, or his attorney, who shall have appeared in such action or proceeding, except such party or parties as shall be present in person or by attorney when the declaration shall be made." (Italics added.)

In *Cadenasso* v. *Bank of Italy,* 214 Cal. 562 [6 P.2d 944] the plaintiff was first informed of the disqualification of the judge long after the trial and while the matter was on appeal. He took steps immediately to have the judgment vacated. The court said at pages 567-568:

"Furthermore, it is expressly held in the *Lindsay-Strathmore* case (*Lindsay-Strathmore Irr. Dist.* v. *Superior Court,* 182 Cal. 315 [187 P. 1056]), quoting with approval from the case of *Johnson* v. *German etc. Co.,* 150 Cal. 336 [88 P. 985], 'any act of a disqualified judge in violation of the provisions of the statute (sec. 170, Code Civ. Proc.) is absolutely void wherever brought in question'. It is further held in the same case (*Lindsay-Strathmore* case, p. 333) : 'It is also the uniform rule under these statutes, that where such disqualification exists, consent of the parties cannot impart validity to the proceedings and that a party to the action who desires to attack them is not estopped from doing so by the fact that he

attended during the trial without raising the objection. (Citing authorities.)' In the case of *City of Vallejo* v. *Superior Court, supra,* (199 Cal. 408 [249 P. 1084, 48 A.L.R. 610]) this court on page 418 of the opinion said: "In the face of these authorities we are constrained to hold that the interest of the respondent judge herein [ownership of stock in a bank interested in the litigation] in these actions arising out of his relation to said bank was at all times during the pendency thereof and still is such as to bring him within the disqualification to sit or act therein defined in section 170, subdivision 1, of the Code of Civil Procedure. It follows necessarily that whatever action, orders or judgment may have been taken, made, given or entered by said judge in said actions, or either of them, during the existence of such disqualification, the same and each of them were, are and continued to be wholly void. [Citation.]' These authorities are a conclusive answer to the contention of the defendants herein that the plaintiffs have waived their right to attack the judgment in the former action by asking for a rehearing and after securing the same rearguing the case before this court. The effect of the holding in these cases is that said judgment is wholly void, and that no estoppel or waiver may be imputed to plaintiffs by reason of their efforts to secure a reversal of said judgment after knowledge of the disqualification of the trial judge."

And at page 570: ". . . Whatever may be the effect of section 170 of the Code of Civil Procedure, as amended in 1927, we do not think it was the intention of its framers to deprive a litigant of the right to object to the disqualification of a trial judge, by reason of his interest in the action when the litigant did not discover the facts constituting the ground of the judge's disqualification until after the commencement of the action. 'It is an ancient maxim applicable in all cases, civil or criminal, where judicial functions are to be exercised, whether in proceedings of inferior tribunals or in courts of last resort, that no man ought to be a judge in his own cause, a maxim which appeals with such force to one's sense of justice that it is said by Lord Coke to be a natural right so inflexible that an act of parliament seeking to subvert it would be declared void.' "

And in *Wickoff* v. *James*, 159 Cal.App.2d 664, 670 [324 P.2d 661], it is said:

"It is of course a fundamental rule that no judge should preside in a case in which he is not wholly free, disinterested, impartial and independent. The various grounds of disqualifi-

cation have been set out in great detail in our Code of Civil Procedure.''

In *Evans* v. *Superior Court,* 107 Cal.App. 372, 380, 381, 382 and 383 [290 P. 662], it is appropriately set forth:

''. . . Or in other words, does there exist in the mind of the trial judge such bias or prejudice against these petitioners that it is improbable by reason thereof that a fair and impartial trial can be had before him? Our Supreme Court in *Estate of Friedman,* 178 Cal. 27 [172 P. 140] declared that bias or prejudice is a condition of mind. Likewise, practically the same rule is laid down in 15 Ruling Case Law, at page 530, in the following language: 'The words ''bias'' and ''prejudice'' as used in the law of the subject under consideration refer to the mental attitude or disposition of the judge towards a party to the litigation, and not to any views that he may entertain regarding the subject matter involved.' Funk & Wagnall's Standard Dictionary defines 'bias' as 'a mental predilection or prejudice.' Webster's New International Dictionary gives this definition: 'A leaning of the mind; propensity or prepossession toward an object or view, not leaving the mind indifferent; bent, tendency; inclination; prejudice.' 'Bias' is a particular influential power which sways the judgment—the inclination of mind toward a particular object—and is not synonymous with 'prejudice.' A man cannot be prejudiced against another without being biased against him, but he may be biased without being prejudiced. [Citation.] Quoting from 15 Ruling Case Law, 530, we read: 'The basis of the disqualification is that personal bias or prejudice renders the judge unable to exercise his functions impartially in the particular case,' citing *Ex parte American Steel Barrel Co.,* 230 U.S. 35 [57 L.Ed. 1379, 33 S.Ct. 1007].

''. . . Webster defines 'impartial' as 'not partial; not biased in favor of one party more than another; indifferent; unprejudiced; disinterested.' In Funk & Wagnall's Standard Dictionary we find the word 'impartial' defined as follows: 'Not disposed to prefer or favor one above another; unbiased; unprejudiced; just; fair.' . . .

''. . . . . . . . . . . . .

'' 'The bias or prejudice which may disqualify a judge must be of a character calculated to seriously impair his partiality [*sic*] and sway his judgment.' . . . 'The judge should not only be honest and impartial, but his acts and conduct should be such that there can be no foundation for

questioning his motives. It is apparent that the section may be greatly abused by dishonest litigants or unscrupulous lawyers. It is therefore the duty of the trial judge to carefully scrutinize each case, to the end that the law may not be abused for sinister purposes. If the trial judge is convinced from the facts of the integrity of his own conduct and motives, of the fact that his sole desire is to see the law applied with equal and exact justice to all, and further that the object of the party who alleges the disqualification is to thwart justice, or to get the case before another judge of his own choosing, he should have courage to act accordingly. On the other hand, where the facts are honestly stated, and when so stated they point to a certain condition that would absolutely influence men in the business transactions of life, *and when applied to the particular case would lead a reasonable person to hesitate as to whether or not the judge could, under the circumstances, considering the weaknesses of human nature, entirely ignore such facts, there should be no hesitation in calling in another judge, so that the fountain head of justice should be above suspicion.*

' . . . On the other hand, *is it fair and just to allow a judge who has such a definite, positive, fixed and firm belief, justifiable though it may be,* concerning these petitioners, the two defendants, who were regarded by him as pirates and falsifiers, to again pass upon the issues of fact in a case where the defendants will undoubtedly be material witnesses? Would a reasonable person hesitate as to whether or not the trial judge could, under the circumstances, considering the weaknesses of human nature, entirely ignore such facts—the belief that the petitioners had committed perjury? Can the judge ignore his opinion and belief, though honest it may be, that these petitioners have wilfully testified falsely? We think not. 'Is it made to appear probable that, by reason of bias or prejudice of such judge . . . a fair and impartial trial cannot be had before him?' (Code Civ. Proc., § 170, as amended.) We think it has. Furthermore, it would be unfair to ask a judge, under these circumstances, to again try issues of fact involving the honor, integrity and veracity of men whom he had so recently condemned and denounced.'' (Italics added.)

The judge in this case knew of his attitude and state of mind. The petitioners had no way of knowing the extent of his feelings until after the hearing when they were permitted to read the letter of January 27, 1966 (''this adoption should be nipped in the bud'') and they then promptly moved to

vacate the judgment and moved for a new trial. We conclude that the judge, under the circumstances, should have disqualified himself in the first instance and not attempted to hear the matter with his state of mind.

■ " 'The matter of adoption rests in the sound discretion of the court and in the exercise of that discretion information from all proper sources should be sought by the one who must determine the matters so momentous to the infant—the future home and the influences which shall surround the minority of the child. No higher discretion than this is vested in a court. After all of the formalities prescribed by the statues have been complied with, the court must make the order that the child shall thenceforth be treated as the child of the adopting petitioners only "if satisfied that the interests of the child will be promoted by the adoption." (Civ. Code, § 227.)' [Citation.]" (*Adoption of Thevenin*, 189 Cal.App.2d 245, 252-253 [11 Cal.Rptr. 219].)

We are persuaded in this case that the judge abused the discretion which is lodged with him in such matters. We are cognizant of the fact that adoption proceedings are special in nature and written findings are not required, and the question is not one of sufficiency of the evidence, but only whether the court abused its discretion in granting or denying the petition.

In *Bailey* v. *Taaffe*, 29 Cal. 422, at page 424, referring to a discretion of the judge, it is stated: "The discretion intended, however, is not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles. It is not a mental discretion, to be exercised *ex gratia*, but a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice."

And in *Lybecker* v. *Murray*, 58 Cal. 186, 189, it is said: ". . . Under no circumstances is the discretion of the Court to be exercised arbitrarily, but it is a discretion, governed by legal rules, to do justice according to law or to the analogies of the law, as near as may be. This is the rule as laid down and well stated in *Ex parte Hoge*, 48 Cal. 3, as also in *Ex parte Marks*, 49 Cal. 680. It must be exercised within the limitations above stated to promote substantial justice in the case. . . ."

*Berry* v. *Chaplin*, 74 Cal.App.2d 669, 672 [169 P.2d 453], recites: "In a legal sense discretion is abused whenever in the

exercise of its discretion the court exceeds the bounds of reason, all of the circumstances before it being considered.''

Here it must be clear that there is no evidence whatsoever to support the determination made by the judge excepting that the petitioners are deaf-mutes. All of the evidence and all of the recommendations by the experts and others are in favor of the petitioners.

In *Stack* v. *Stack*, 189 Cal.App.2d 357 [11 Cal.Rptr. 177], it is stated: ''We find no authority distinguishing between insufficient evidence and abuse of discretion. It would seem obvious that, if there were *no* evidence to support the decision, there would be an abuse of discretion. But we do not think that it follows that there can be no abuse of discretion if there be any evidence to support the decision. It is certainly true that there could be a case where the decision is obviously not for the best interests of the child, even though there is some evidence to support it. We think that a number of cases cited in this opinion, in which an order was reversed, fall into this category. Yet the latest decision of the Supreme Court in *Sanchez* v. *Sanchez, supra,* 55 Cal.2d 118, 126 [10 Cal.Rptr. 261, 358 P.2d 533], seems to equate abuse of discretion with lack of evidence.'' (P. 368.)

██ This case is not an agency adoption matter, but, to the contrary, it is a direct placement by a parent of the child into the home of petitioners with full knowledge of the facts. Section 226c, Civil Code, provides in part: ''At the hearing, if the court sustains the recommendation that the child be removed from the home of petitioners because the agency has recommended denial or the petitioners desire to withdraw the petition or the court dismisses the petition and does not return him to his parents, the court shall commit the child to the care of the State Department of Social Welfare or the licensed county adoption agency, whichever agency made the recommendation, for that agency to arrange adoptive placement or to make a suitable plan. . . .''

Here there was no sustaining of a recommendation that the child be removed from the home of petitioners because the agency recommended denial, the petitioners did not withdraw the petition and the court did not dismiss the petition. We see nothing in that section which gives to the judge, under the circumstances of this case, the right to commit Scott to the Los Angeles County Bureau of Adoptions. The judge might have had, under some circumstances, the right to deny the petition, but here he had no right to dismiss it and he did not do so.

The petition was denied and the child Scott should have been returned to his own abode. In this case, as pointed out by the Supreme Court in *Superior Court* v. *District Court of Appeal*, 65 Cal.2d 293 [54 Cal.Rptr. 119, 419 P.2d 183], Scott was placed elsewhere immediately following the hearing. The child immediately suffered adverse physical and mental reactions. About the latter part of July 1966, the child was placed with the sister of Mrs. Christensen where the Christensens would be available for contact with Scott. A medical report referred to by the Supreme Court in a footnote* in the opinion concerning that time and occasion is significant.

We are also persuaded that petitioners were denied the equal protection and due process of the law guaranteed by the United States Constitution in that the denial of the petition was made solely upon the ground that petitioners were deaf-mutes. The Supreme Court in *Superior Court* v. *District Court of Appeals, supra,* at page 295, determined that "The basis for petitioner's denial was the fact that real parties in interest are deaf-mutes."

Here the judge, for all intents and purposes, has stated, in effect, that he will systematically strike any and all deaf-mute petitioners from any list of prospective adopting parents. Whatever the circumstances may be, however competent and qualified the prospective adopting parents may be, if they are deaf-mutes, their petition to adopt will be denied.

The "equal protection" clause requires that persons under like circumstances be given equal protection in the enjoyment of personal rights and the prevention and redress of wrong.

Here the court, acting for the state, engaged in an 'intentional or purposeful discrimination" so that insofar as petitioners are concerned, it is equivalent to the discrimination being incorporated into the statute.

---

*" 'Real parties in interest have filed herein an affidavit, dated August 9, 1966, by the child's attending physician, Neil N. Litman, M.D., a professor at U.C.L.A. School of Medicine, reading: 'I examined the above-named child on August 9, 1966. There had been a dramatic change in the child since his previous examination July 29, 1966 [the day after real parties in interest regained custody of the child after his residence in another foster home for approximately a month]. He was now happy, content, he sat up without support and walked hanging on. In addition, he had gained 8 ounces in this 11-day period, his weight being 16 pounds, 6 ounces, compared to 15 pounds, 14 ounces on July 29, 1966. The weeping skin lesions previously noted had completely healed.

" 'There is no question in my mind that the improvement in the child's physical and neurological well-being is directly related to his renewed exposure to Mr. and Mrs. Wayne Christensen. In my opinion it would be tragic and disastrous for this child to be denied the care of this family in the future.'' (P. 297.)

The equality guaranteed by the equal protection clause is equality under the same conditions and among persons similarly situated.

Equal protection to all is the basic principle upon which the law rests.

The state, it is to be presumed, has no designs to inflict an arbitrary deprivation of rights on deaf-mutes. Special privileges are obnoxious and discriminations against persons for such physical disability are still more so.

The judgment and order are, and each is, reversed.

Wood, P. J., and Lillie, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied July 19, 1967.