Filed 10/17/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| FCM INVESTMENTS, LLC,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GROVE PHAM, LLC, et al.,<br><br>    Defendants and Appellants. | D080801<br><br><br><br>(Super. Ct. No. RIC1902326) |

APPEAL from a judgment of the Superior Court of Riverside County, Daniel A. Ottalia, Judge. Reversed. Request for judicial notice denied.

Enenstein Pham & Glass, Teri Thuy Pham, Philip M. Duclos and Thang Le, for Defendants and Appellants.

Law Offices of Richard M. Foster and Richard Martin Foster for Plaintiff and Respondent.

When parties agree to private arbitration, they bargain for very limited judicial review. One of the few grounds for vacating an arbitration award is misconduct on the part of a neutral arbitrator substantially prejudicing the rights of a party. (Code Civ. Proc.,[1] § 1286.2, subd. (a)(3).) Misconduct includes circumstances creating a reasonable impression of possible arbitrator bias.

In this high-stakes commercial arbitration over a canceled real estate deal, the arbitrator found the seller in breach based largely on an assessment of witness credibility. In the arbitrator's view, defendant Phuong Pham lacked credibility because she used an interpreter during the arbitration proceedings. Reasoning that she had been in the country for decades, engaged in sophisticated business transactions, and previously functioned in some undisclosed capacity as an interpreter, the arbitrator felt that her use of an interpreter at the arbitration was a tactical ploy to seem less sophisticated.

Given the exceedingly narrow scope of judicial review of arbitration awards, assuring both the actual and apparent impartiality of a neutral arbitrator is crucial to the legitimacy of arbitration as a dispute resolution mechanism. Courts are empowered to act where that impartiality can reasonably be questioned. Here, the arbitrator's credibility finding rested on unacceptable misconceptions about English proficiency and language acquisition. These misconceptions, in turn, give rise to a reasonable impression of possible bias on the part of the arbitrator requiring reversal of the judgment and vacating the arbitration award.

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

FACTUAL AND PROCEDURAL BACKGROUND

In January 2019, plaintiff FCM Investments, LLC (FCM) signed a Purchase Agreement to buy real property in Riverside, California from defendant Grove Pham, LLC (Grove), a company owned by Phuong Pham. Grove operated a nursing home on that property with resident patients. FCM agreed to pay Grove $7.45 million to buy the property, with an upfront deposit of $500,000. Escrow was to close in 30 days.

Disputes arose during the due diligence process, with the parties extending the escrow closing date several times. When it signed the Purchase Agreement, FCM believed that Grove and Phuong Pham owned the license to the facility. It later learned, however, that the license was held by Kevin Longha and the entities Arlington Management, LLC and Arlington II Senior Care, LLC. Concerns grew as FCM was unable to obtain necessary financial records for the business. FCM was also worried that dropping patient numbers might suggest Longha and the Arlington entities were intentionally sabotaging the business in an effort to scuttle the deal so they could buy the property for themselves at a lower price.

By April 2019, FCM filed a complaint in Riverside Superior Court against Grove, Phuong Pham, Trish Pham (Phuong's daughter),[2] Longha, and the Arlington entities, alleging that their dilatory tactics were preventing completion of the sale. The Purchase Agreement contained two alternative

_____

[2]    We refer to Phuong Pham and Trish Pham by their first names for clarity, intending no disrespect. We also refer to Phuong, Trish, and Grove collectively as the Phams for simplicity.

    Other parties named in FCM's complaint did not participate in the eventual arbitration. FCM voluntarily dismissed the Arlington entities in October and November 2019, while Longha received a bankruptcy discharge in August 2021. Arbitration proceedings proceeded solely among FCM, Grove, Phuong, and Trish.

dispute resolution provisions. The parties were required to mediate "any dispute or claim arising between [FCM and Grove] out of this Agreement." Any dispute that couldn't be settled through mediation had to go to arbitration. Consistent with these provisions, the parties successfully mediated their dispute and signed a Joint Addendum in May 2019 amending the Purchase Agreement.

Pursuant to the Joint Addendum, FCM increased the purchase price to $7.7 million and the deposit to $650,000. Escrow was set to close in July 2019, and all but three seller contingencies were lifted: (1) Grove had to maintain "at least 66 live-in patients"; (2) Longha had to permit use of his license for the nursing home for 12 months until FCM obtained its own; and (3) the license had to be kept in good standing with state regulatory agencies.

Tensions developed soon after the Joint Addendum was signed, and FCM pulled out of the deal before escrow could close.[3] Grove and Phuong moved to compel arbitration in October. That December, the Phams stipulated to arbitrate their disputes before Honorable Judith C. Chirlin (Ret.) of Judicate West. The lawsuit was stayed pending arbitration.

Arbitration proceeded over two days in June 2021. The central question was whether Grove breached its obligations under the Joint Addendum, justifying FCM's cancellation of escrow. Ultimately, the arbitrator concluded that the Phams breached the Joint Addendum by failing to provide proof of 66 live-in patients or a notarized agreement regarding the use of Longha's license. FCM was accordingly justified in terminating escrow

---

[3]    According to a declaration later filed by FCM's counsel, FCM tried unsuccessfully to obtain a notarized agreement from Longha to operate the nursing home under his license. The Phams had until June 6, 2019 to turn over due diligence materials. Concerned about their delays, FCM pulled out to avoid losing its deposit.

and did not breach. FCM was awarded a return of its $650,000 deposit with interest, loss-of-bargain damages of $9.1 million plus interest, $127,040 in attorney's fees, and $20,048 in costs.[4]

In the arbitrator's view, although the transaction "was rather complicated," her decision in the case was "made easier by an evaluation of the credibility of the witnesses." She felt the case was unique "both in 12 years of doing arbitration and 24½ years on the Los Angeles County Superior Court, in that the lack of credibility issues are so rampant and obvious." The arbitrator did not find Phuong or Trish credible. In explaining why, she highlighted as the key example Phuong's use of an interpreter:

> "Among the items that stand out, is Mrs. Pham's use of an interpreter. While the Arbitrator understands that people for whom English is a second language frequently prefer to testify in their native language in important legal matters, Mrs. Pham's use of an interpreter appeared to the Arbitrator to be a ploy to appear less sophisticated than she really is. She has been in the country for decades, has engaged in sophisticated business transactions and has herself functioned as an interpreter."[5]

"That being said," the arbitrator went on, "the one part of Mrs. Pham's testimony that appeared truthful is that she did not want to sell the business and property to FCM because she believed she could sell it for more money than her agreement with FCM contemplated."

---

[4] There is no discussion whether Trish or Phuong were alter egos of Grove Pham or on what basis the arbitrator found them jointly responsible for contractual breach. Absent a record of arbitration proceedings, we have no way to know whether this issue was litigated or the basis for the arbitral award against the individual defendants.

[5] The arbitrator found that Trish undermined her own credibility in her misstatements to a potential witness.

FCM filed a petition to confirm the arbitration award, while the Phams moved to vacate it pursuant to the California Arbitration Act (Code of Civ. Proc., § 1280 et seq.).[6]  In moving to vacate, the Phams claimed the arbitrator exceeded her powers because the transaction amounted to an illegal contract to transfer the license of a nursing home in violation of the California Residential Care Facilities for the Elderly Act (Health & Saf. Code, § 1569 et seq.).  Emphasizing the narrow scope of judicial review, FCM opposed the petition to vacate.  Following hearings in December 2021 and January 2022, the court denied the Phams's motion and entered judgment for FCM confirming the arbitration award.

## DISCUSSION

Although the Phams seek to vacate the arbitration award on multiple grounds, we largely focus on one.  In making an adverse credibility finding against Phuong based on her use of an interpreter, the arbitrator's decision creates a reasonable impression of possible bias requiring that the arbitration

---

[6]     The Purchase Agreement provides that "[e]nforcement of this agreement to arbitrate shall be governed by the Federal Arbitration Act [(FAA)]."  But the FAA's sections on judicial review (9 U.S.C. §§ 10, 11) "do not apply in state court."  (*Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1351.)  Instead "the procedural provisions of the [California Arbitration Act] apply in *California* courts by default."  (*Valencia v. Smyth* (2010) 185 Cal.App.4th 153, 174.)  Both federal and state schemes derive from common roots and share common features.  (*Cable Connection,* at pp. 1343–1344.)  As is claimed on appeal, both laws authorize vacating an arbitration award based on the arbitrator's prejudicial misconduct or conduct that exceeds the arbitrator's powers.  (Code Civ. Proc., § 1286.2, subd. (a); 9 U.S.C. § 10(a).)

award be vacated.  Because it may bear on further proceedings, we also conclude that Trish and Pham agreed to arbitrate their dispute with FCM.[7]

A.   *Although judicial review of arbitration awards is limited, arbitrator bias furnishes a proper basis to vacate an award, which is a claim the Phams did not forfeit by failing to raise it in the superior court.*

"[P]rivate arbitration is a process in which parties voluntarily trade the safeguards and formalities of court litigation for an expeditious, sometimes roughshod means of resolving their dispute." (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 831.)  Respecting this bargain limits the grounds for judicial review.  (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 10; *Richey v. AutoNation, Inc.* (2015) 60 Cal.4th 909, 916.)  "[A]n arbitrator's decision is not generally reviewable for errors of fact or law, whether or not such error appears on the face of the award and causes substantial injustice to the parties." (*Moncharsh,* at p. 6.)  The narrow grounds stated in section 1286.2 for vacating an award "protect against error that is so egregious as to constitute misconduct or so profound as to render the process unfair." (*Heimlich v. Shivji* (2019) 7 Cal.5th 350, 368 (*Heimlich*).)  A party challenging an arbitration award and trial court judgment confirming that award bears the burden of establishing entitlement to relief.  (*Id.* at p. 370.)

As is relevant to our decision, the Phams contend that the arbitrator exhibited linguistic and/or national origin bias in making an adverse credibility finding against Phuong based on her use of a translator.  Pursuant

---

7    The Phams seek judicial notice of postjudgment materials that were not presented to the trial court.  " 'Reviewing courts generally do not take judicial notice of evidence not presented to the trial court.' " (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.)  Because these materials are in any event irrelevant to our analysis, judicial notice is denied.  (See *Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482.)

to section 1286.2, subdivision (a)(3), an award must be vacated where "[t]he rights of the party were substantially prejudiced by misconduct of a neutral arbitrator." "Misconduct" in this context includes actions that create a reasonable impression of possible bias. (*Betz v. Pankow* (1995) 31 Cal.App.4th 1503, 1507−1508 (*Betz II*).)

The Phams did not raise their claim of bias before the trial court in moving to vacate the award. FCM contends that as a result, the Phams have forfeited the argument. The Phams respond that forfeiture is not automatic, and courts have discretion to address new issues on appeal that present pure questions of law on undisputed facts. In their view, the award itself furnishes an adequate basis for judicial review. Even if forfeiture applies, the Phams maintain that bias goes to the integrity of the arbitration process, warranting discretionary departure from the rule. As we explain, the Phams have the better argument.

"An appellate court will ordinarily not consider procedural defects or erroneous rulings in connection with relief sought or defenses asserted, where an objection could have been, but was not, presented to the lower court by some appropriate method." (9 Witkin, Cal. Procedure (6th ed. 2021) Appeal, § 420, p. 455.) The forfeiture doctrine is designed to promote fairness to the trial court and opposing parties, permitting error correction by the trial court in the first instance and the development of a factual record. (*Velasquez v. Centrome, Inc.* (2015) 233 Cal.App.4th 1191, 1210−1211 (*Velasquez*).) However, its application is not automatic: appellate courts retain discretion to consider points that were not raised before the trial court. (*Id.* at p. 1210; *Redevelopment Agency v. City of Berkeley* (1978) 80 Cal.App.3d 158, 167 (*Redevelopment Agency*).)

There are two broad exceptions to the forfeiture rule, and both apply here. First, the rule does not apply to a question of law that can be decided "from facts which are not only uncontroverted in the record, but which could not be altered by the presentation of additional evidence." (*Redevelopment Agency, supra,* 80 Cal.App.3d at p. 167; see generally, 9 Witkin, Cal. Procedure (6th ed. 2021) Appeal, § 426, p. 461.) For instance, in *Velasquez* a personal injury plaintiff challenged a trial court's comment to prospective jurors about his undocumented status. This claim was cognizable despite his failure to file a new trial motion alleging juror bias below because developing an additional factual record was "not necessary . . . to facilitate meaningful appellate review." (*Velasquez, supra,* 233 Cal.App.4th at p. 1210.) The same can be said here. The Phams argue that on its face, the award creates a reasonable impression of possible linguistic and/or national origin bias. Because no additional factual record is needed to review this question of law on undisputed facts, it has not been forfeited.[8]

A second exception to the forfeiture rule applies to "matters involving the public interest or the due administration of justice." (9 Witkin, Cal. Procedure, (6th ed. 2021) Appeal, § 427, p. 463.) This was a separate ground for not applying forfeiture in *Velasquez*, where the bias claims raised by the

---

[8]    Citing the deference given to an arbitrator's factual findings, FCM suggests there must have been some evidence presented at arbitration that Phuong had worked as an interpreter. FCM further suggested at oral argument that it could have developed a fuller record of Phuong's English proficiency and interpreter work had the Phams moved to vacate the award for arbitrator bias before the trial court. But even if we assume that some evidence was or additional evidence might have been presented regarding Phuong's unspecified past work as an interpreter, the arbitrator's decision itself would still support a reasonable inference of possible bias for reasons we will explain. Additional factual development is not necessary to evaluate the Phams's claim.

undocumented plaintiff were "of sufficient public interest to weigh against forfeiture." (*Velasquez, supra,* 233 Cal.App.4th at p. 1211.)  Similarly in *Catchpole v. Brannon* (1995) 36 Cal.App.4th 237 (*Catchpole*), claims of judicial bias were not forfeited where a trial judge did not find a sexual harassment plaintiff to be credible based "on stereotyped thinking about women and misconceptions of social and economic realities many women may confront." (*Id.* at p. 249.)  Notwithstanding the plaintiff's failure to raise her bias claim below, there was no forfeiture on appeal where "[t]he issue of judicial gender bias obviously involves both a public interest and the due administration of justice." (*Ibid.*)  Questions of linguistic and national origin bias likewise implicate both the public interest and due administration of justice.  For thirty years, this state has recognized "the need to provide equal justice under the law to all California residents and citizens" irrespective of language limitations.  (Gov. Code, § 68560, subd. (e).)  All litigants are entitled to impartial adjudication free from arbitrary considerations of race, gender, or national origin.  (*Betz v. Pankow* (1993) 16 Cal.App.4th 919, 926 (*Betz I*).)

Thus, both exceptions to the forfeiture rule apply as to the Phams's claim of arbitrator bias—it raises a pure question of law on undisputed facts, and it implicates weighty concerns involving the public interest and due administration of justice.  And even if the general forfeiture rule rather than its exceptions applied, we would exercise our discretion to reach the claim given the interests at stake.  (See *Grabowski v. Kaiser Foundation Health Plan, Inc.*, 64 Cal.App.5th 67, 75, fn. 3.)

B.    *The record creates a reasonable impression of possible bias.*

The arbitrator's sparse four-page decision in this breach of contract case rose and fell on witness credibility.  She found the Phams's main

10

witness, Phuong, not credible based on misconceptions about English proficiency and language acquisition. As we explain, the credibility finding at the heart of the arbitration award raises an impression of possible bias requiring that the award be vacated.

    1.    *Legal Principles*

While arbitration awards are "nearly immune" from attack, "one of the limited grounds for challenge is bias on the part of the arbitrator." (*Betz II, supra,* 31 Cal.App.4th at pp. 1507−1508.) "[A]ny tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias." (*Commonwealth Coatings Corp. v. Continental Casualty Co.* (1968) 393 U.S. 145, 150 (*Commonwealth Coatings*).) Arbitrators are held to the same standard as judges—"they should be disqualified if a person aware of the facts might reasonably entertain a doubt that the arbitrator would be able to be impartial." (*Betz I, supra,* 16 Cal.App.4th at p. 926; see § 170.1, subd. (a)(6)(A)(iii).) Given inherent challenges of proving bias and the importance of maintaining public confidence in our justice system, a showing of actual bias is not required. (*United Farm Workers of America v. Superior Court* (1985) 170 Cal.App.3d 97, 104 (*United Farm Workers*); *Catchpole, supra,* 36 Cal.App.4th at p. 246.) Instead, the test is whether a hypothetical reasonable person (i.e., a disinterested, well-informed, thoughtful member of the public) would form *an impression of possible bias* on the part of the arbitrator. (*Betz II,* at pp. 1507−1508; accord *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 389 (*Haworth*).)

" 'An impression of possible bias in the arbitration context means that one could reasonably form a belief that an arbitrator was biased for or against a party for a particular reason.' " (*Haworth, supra,* 50 Cal.4th at

11

p. 389, citing *Betz II, supra,* 31 Cal.App.4th at p. 1511.) The test is objective and fact-specific; there is no bright-line demarcation for the impression of bias, and each case must be considered in light of the particular facts involved. (*Betz II,* at p. 1508.) As the parties seeking to vacate the arbitration award, the Phams bear the burden to establish a reasonable impression of possible bias. (*Betz I, supra,* 16 Cal.App.4th at p. 926.)

2. *Analysis*

"Sensitivity toward language difficulties is the hallmark of our multi-lingual state." (*People v. Aguilar* (1984) 35 Cal.3d 785, 794; see Gov. Code, § 68560, subd. (e).) Across California, "approximately 40 percent of us speak a non-English language at home; there are more than 200 languages and dialects spoken; roughly 20 percent of us (nearly 7 million) have English language limitations."[9]

Against this backdrop, the arbitrator concluded that the case before her turned on witness credibility. She acknowledged the crucial question was whether Grove Pham breached the Joint Addendum, thereby justifying FCM's cancellation of escrow. In her view, credibility determinations helped cut through a "rather complicated" case. In finding that Phuong lacked credibility, she articulated only one reason—Phuong's use of an interpreter. The arbitrator made passing reference to the fact that "people for whom English is a second language frequently prefer to testify in their native language in important legal matters." But she quickly pivoted to characterize Phong's use of an interpreter as a "ploy to appear less

---

[9] Judicial Council of California, Strategic Plan for Language Access in the California Courts, letter from the Chief Justice of California (2015) page 5 <https://www.courts.ca.gov/documents/CLASP_report_060514.pdf> archived at <http://perma.ca/HV8H-VTAX> (as of Oct. 16, 2023) (hereafter Letter from the Chief Justice).

sophisticated than she really is." In explaining why, the arbitrator highlighted three things: Phuong had (1) lived in the United States "for decades"; (2) "engaged in sophisticated business transactions"; and (3) "herself functioned as an interpreter."

Arbitration proceedings were unreported, leaving us to guess what evidence, if any, was presented as to Phuong's English proficiency during arbitration. The Phams make an offer of proof in their opening brief that Phuong was neither a certified interpreter nor functioned as one "beyond providing general help to other refugees when she first emigrated." FCM responds that given the arbitrator's express finding, there must have been evidence presented at arbitration that Phuong had functioned as an interpreter. It maintains that Evidence Code section 780 grants a trier of fact broad leeway to determine witness credibility and claims that nothing in the record suggests that Phuong's or Trish's ethnic background mattered to the arbitrator. We are unconvinced.

As a factual matter, FCM's own pleadings undercut the notion that Phuong's use of an interpreter was a ploy. In its original complaint, filed long before the relationship between the parties completely unraveled, FCM acknowledged that Phuong used her daughter as a translator during a conference call based on her daughter's "proficiency in English." If Phuong relied on her daughter to translate a conference call before the deal unraveled, it seems unsurprising that she would use an interpreter to testify in commercial arbitration proceedings.

But whatever Phuong's actual fluency in English, the four corners of the award raise an impression of possible arbitrator bias. Turning to the reasons cited by the arbitrator, living in the United States for decades does not reasonably imply sufficient English fluency to participate in arbitration

13

without the assistance of an interpreter. A recent tabulation of Census data reveals that over 40 percent of foreign-born residents continue to speak English "less than very well" (i.e., the marker of a limited English-proficient person, or LEP) after living in the United States for over 20 years.[10]

Nor is it accurate to assume that being LEP equates with a lack of business sophistication or economic success.[11] Historic enclaves like San Francisco's Chinatown, Los Angeles's Koreatown, and Orange County's Little Saigon speak to the ability of immigrants to run thriving businesses despite potential limitations in language skills. The fact that Phuong had "engaged in sophisticated business transactions" does not reliably predict her English proficiency, much less her ability to proceed in a high-stakes commercial arbitration without an interpreter.

Finally, it is unclear what the arbitrator meant in stating Phuong had "herself functioned as an interpreter." Every day across the country, immigrants and refugees turn to family and friends to fill language gaps in

[10] PEW Research Center, Statistical Portrait of the Foreign-Born Population in the United States, 2018 (Aug. 20, 2020) <https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.pewresearch.org%2Fhispanic%2Fwp-content%2Fuploads%2Fsites%2F5%2F2020%2F08%2FPew-Research-Center_Language-Current-Data_Statistical-Portrait-of-the-Foreign-Born-2018.xlsx&wdOrigin=BROWSELINK/> archived at <https://perma.cc/V3UJ-99XE> (as of Oct. 16, 2023).

[11] See, e.g., Semple, *Moving to U.S. and Amassing a Fortune, No English Needed*, New York Times (Nov. 8. 2011) <https://www.nytimes.com/2011/11/09/nyregion/immigrant-entrepreneurs-succeed-without-english.html> archived at <https://perma.cc/AF6A-KMZS> (as of Oct. 16, 2023).

healthcare, business, and government settings.[12] The complaint's reference to Phuong's use of her daughter Trish to translate a conference call with FCM offers a typical example. Phuong herself may have rendered similar assistance for other newcomers as claimed in the opening brief. As a general matter, language proficiency runs along a continuum. "Many individuals have some proficiency in more than one language, but are not completely bilingual."[13] Without a clearer indication of *how and where* Phuong acted as an interpreter, the mere fact that she may have served as one at some point in time would not permit a determinative finding on credibility. More importantly, the arbitrator's reliance on that fact without qualification does not dispel a reasonable impression of possible bias.

In evaluating arbitrator bias, we consider all relevant contextual facts. (*Betz II, supra,* 31 Cal.App.4th at p. 1511.) Here, that means reviewing the award as a whole. The four-page decision is sparse and virtually devoid of legal analysis. In deciding whether a breach occurred, the arbitrator relied mainly on her assessment of witness credibility. Her credibility finding as to Phuong relied on uninformed misconceptions about English proficiency and

---

[12] See, e.g., Pew Research Center, In Their Own Words: Asian Immigrants' Experiences Navigating Language Barriers in the United States (Dec. 19, 2022) <https://www.pewresearch.org/race-ethnicity/2022/12/19/how-asian-immigrants-receive-help-while-navigating-language-barriers/> archived at <https://perma.cc/UKR6-4MKB> (as of Oct. 16, 2023); Eldred, *With Scarce Access to Interpreters, Immigrants Struggle to Understand Doctors' Orders,* National Public Radio (Aug. 15, 2018) <https://www.npr.org/sections/health-shots/2018/08/15/638913165/with-scarce-access-to-medical-interpreters-immigrant-patients-struggle-to-unders> archived at <https://perma.cc/8UHT-NHTD> (as of Oct. 16, 2023).

[13] LEP.gov, Commonly Asked Questions (questions regarding LEP individuals) (Nov. 2022) <https://www.lep.gov/commonly-asked-questions> archived at <https://perma.cc/8UJ4-GHAP> (as of Oct. 16, 2023).

language acquisition. (See *Catchpole, supra,* 36 Cal.App.4th at p. 249 [court's credibility finding was rooted in gender stereotypes]; *State v. Smith* (Kan. 2018) 423 P.3d 530, 536 [court's credibility finding was based on impermissible assumptions about juvenile defendant's music preference].) Bearing in mind that an arbitration award must be vacated where there is *an impression of possible bias* irrespective of actual bias, we find that standard amply met.[14] Broad discretion to evaluate witness credibility (Evid. Code, § 780) does not permit credibility assessments rooted in bias.

In our judicial system, bias is particularly disquieting where it affects a trial court's factual findings or credibility determinations, given the deference afforded to those rulings on appeal. (*Catchpole, supra,* 36 Cal.App.4th at p. 247, citing *United Farm Workers, supra,* 170 Cal.App.3d at pp. 104–105.) With judicial review of arbitration awards even more constrained, arbitrator bias is likewise particularly troubling where it implicates factual findings or credibility determinations central to the award. (*Commonwealth Coatings, supra,* 393 U.S. at pp. 148–149; accord *Haworth, supra,* 50 Cal.4th at p. 393; see *Bacall v. Shumway* (2021) 61 Cal.App.5th 960, 961 [insufficiency of the evidence "is not a proper basis to vacate an award"].)

Phuong's decades of living in the United States, savvy business dealings, and unspecified past role as an interpreter do not permit a reasonable, nonspeculative inference that her decision to use an interpreter in this high-stakes commercial arbitration proceedings was a deceptive ploy. In concluding otherwise without any elucidation of supporting facts, the

---

14    Bias entails "the forming of an opinion without due knowledge or examination, although it does not necessarily indicate any ill feeling." (*Adoption of Richardson* (1967) 251 Cal.App.2d 222, 233.) It "is a particular influential power which sways the judgment—the inclination of mind toward a particular object" that may or may not reflect actual prejudice. (*Evans v. Superior Court of Los Angeles County* (1930) 107 Cal.App. 372, 380.)

award raises an impression of possible bias. We have no difficulty concluding on our record that the Phams's rights were substantially prejudiced by possible arbitrator bias, compelling an order vacating the award (§ 1286.2, subd. (a)(3)).

We reach this conclusion mindful of the broader context. A 2011 federal civil rights investigation prompted broad reforms to improve language access statewide throughout California's justice system.[15] In 2015, the Judicial Council released a Strategic Plan for Language Access in the California Courts. That same year, Assembly Bill No. 1657 (Stats. 2014, ch. 721) took effect. That legislation added new statutory provisions emphasizing the importance of providing interpreters "to all parties who require one" (Gov. Code, § 68092.1, subd. (a)) and requiring the Judicial Council to reimburse interpreter costs subject to a civil case priority schedule (Evid. Code, § 756, subds. (a)−(b)).[16] With California now recognizing a limited statutory right to an interpreter in all civil proceedings, courts cannot, as a matter of public policy, draw adverse credibility inferences from a litigant's decision to exercise that right. "Access to the courts for all LEP individuals is critical not just to guarantee access to justice in our state, but

_____

[15] As recipients of federal funding, title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.) requires California courts to provide meaningful access to LEP users. (See, e.g., *Lau v. Nichols* (1974) 414 U.S. 563, 568 [Title VI's prohibition of national origin discrimination banned discrimination based on English proficiency].) The Justice Department initiated a 2011 investigation that led to a collaborative effort with the Judicial Council to address areas of statewide concern. (See U.S. Department of Justice, Civil Rights Division, letter re Complaint No. 171-12C-31 (Nov. 12, 2020) <https://www.justice.gov/crt/page/file/1336441/download> archived at <https://perma.cc/KDK4-8B5V> [as of Oct. 16, 2023].)

[16] Criminal defendants have a constitutional right to an interpreter. (Cal. Const., art. I, § 14.)

to ensure the legitimacy of our system of justice and the trust and confidence of Californians in our court system." (Letter from the Chief Justice, *supra*; see *ante*, note 10.) Denying access based on language proficiency, or burdening a litigant's choice to use an interpreter with adverse inferences, each yield a less-than-level playing field for LEP individuals.

These considerations ring no less true in private arbitration. "All litigants are entitled to a decision free from arbitrary considerations of race, gender, etc., and although arbitrators enjoy considerable latitude in the resolution of both factual and legal issues [citations], they are under the same duty as judicial officers to render decisions free from any influence or consideration of the race, ethnic origin or gender of the parties." (*Betz I, supra,* 16 Cal.App.4th at p. 926.) Justice is served if litigants feel assured that their choice to use an interpreter in arbitration proceedings will not imperil their expectation of impartial decision-making. Public confidence in the judicial system is likewise enhanced if courts do not confirm arbitration awards that raise a reasonable impression of possible language bias on the part of the arbitrator.

C.     *The individual defendants submitted to arbitration.*

Our conclusion that the record raises an impression of possible bias requires vacating the arbitration award on remand. Because it may affect further proceedings between the parties after such an order, we address an additional claim raised by the Phams as to the scope of the arbitrator's powers (§ 1286.2, subd. (a)(4)).

Noting that the Purchase Agreement was between FCM and Grove, the Phams contend that the arbitrator exceeded her powers in holding Phuong and Trish individually liable for damages. While Phuong signed the Joint Addendum, the Phams claim she did so "as an agent and manager" of Grove.

18

They particularly challenge the basis to enter an award against Trish, who only stipulated to arbitrate "the disputes raised in Plaintiff FCM's complaint" and was not named in the cause of action for anticipatory breach asserted there.

Because "[a]rbitration is a matter of consent," the parties' agreement to arbitrate "defines the scope of the arbitrator's power." (*Heimlich, supra,* 7 Cal.5th at p. 358.) Parties are free to define the scope of arbitration as narrowly or broadly as they choose. "There is no public policy favoring arbitration of disputes which the parties have not agreed to arbitrate." (*Engineers & Architects Assn. v. Community Development Dept.* (1994) 30 Cal.App.4th 644, 653; see *United Steelworkers of America v. Warrior & Gulf Navigation Co.* (1960) 363 U.S. 574, 582 ["a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit"]; *Benaroya v. Willis* (2018) 23 Cal.App.5th 462, 475 [arbitrator exceeded his powers by compelling nonsignatory to arbitration agreement to arbitrate and by thereafter finding liability under alter ego theory].)

We question whether Phuong and Trish can raise this claim now. "[A] party who questions the validity of the arbitration agreement may not proceed with arbitration and preserve the issue for later consideration by the court after being unsuccessful in the arbitration." (*Bayscene Resident Negotiators v. Bayscene Mobilehome Park* (1993) 15 Cal.App.4th 119, 129.) But even if they can make the claim, we reject it on its merits.

FCM originally sued for anticipatory breach in April 2019.[17] Following successful mediation, the parties signed the Joint Addendum in May. By July, FCM pulled out of the deal when further disputes emerged as to the parties' obligations under the Joint Addendum. Grove and Phuong moved to compel arbitration in October 2019. In her supporting declaration, Phuong explained that the dispute now centered around whether FCM was entitled to "cancel the transaction without justification," thus entitling Grove to retain its deposit as liquidated damages. Thereafter, all the Phams, including Trish, stipulated "to arbitrate the disputes raised in Plaintiff FCM's complaint."[18] By this point, breach and not anticipatory breach was the central question in deciding whether FCM was justified in canceling escrow.

"In determining the scope of an arbitration provision, the court should give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made." (6 Witkin, Cal. Procedure (6th ed. 2021) Proceedings Without Trial, § 612, p. 1116; see *Rebolledo v. Tilly's, Inc.* (2014) 228 Cal.App.4th 900, 913.) The only reasonable reading of the December 2019 stipulation is that all the Phams, including Trish and Phuong, submitted to arbitration.

---

[17] Specifically, the complaint asserted anticipatory breach against Grove and Phuong and the remaining claims—breach of the implied covenant of good faith and fair dealing, fraud, and negligent misrepresentation—against all defendants. As remedies, the complaint requested specific performance or damages.

[18] Although counsel signed the stipulation on their behalf, Trish and Phuong ratified it by their subsequent failure to disavow or disapprove of it. (See *NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 79.)

Thus, while the arbitration award must be vacated, Phuong's and Trish's agreement to arbitrate stands.  They remain free, of course, to raise any applicable defenses to individual liability at a new arbitration proceeding.

## DISPOSITION

The judgment is reversed, and the trial court is directed to enter an order vacating the arbitration award.  The Phams are entitled to their costs on appeal.


                                                                    DATO, J.

WE CONCUR:



O'ROURKE, Acting P. J.



DO, J.


21